# NATIONAL ASSEMBLY

## OFFICIAL REPORT

**Thursday, 25th March, 2010**

The House met at 2.30 p.m.

*[Mr. Speaker in the Chair]*

PRAYERS

**PETITION**

**Dr. Khalwale**: Mr. Speaker, Sir, I stand here to make a petition on behalf of Kiborowa squatters who are a group of squatters from Trans Nzoia District under an organization called Kiborowa Squatters Alliance. The squatters reside in the rural and peri-urban slums within Trans Nzoia and like our forefathers, remain landless and living under deplorable conditions. Some of those squatters are temporary labourers on the former colonial settler farms now popularly called Agricultural Development Corporation (ADC) farms. Our girls and women are raped and forced into prostitution and early marriages, occasioning high instances of HIV/AIDS and gender biased violence. There are high poverty levels leading to early school dropouts and childhood labour. Despite those squatters making several presentations to the Government with assurances from district commissioners, permanent secretaries and Ministers for Land and Settlement since Independence, our people have yet to see any positive action. We are, therefore, praying through this petition for your humble intervention as a House, so that the Government of the Republic of Kenya may immediately settle all the squatters on the following ADC farms: Sabwani, Sekhendu and Olingatongo ADC farms. We are also praying that the Government restrains those Members of Parliament who are inciting members from non-squatter communities to invade those farms.

**Mr. Speaker:** Order, Dr. Khalwale! You caught my eye to present a petition, but I am in doubt as to whether or not you have, in fact, complied with Standing Order No.204. At least, I have no indication from the Clerk of the National Assembly, which I normally have as a matter of practice, that you have complied with Standing Order No.204. Can you satisfy me that you have done so?

**Dr. Khalwale**: Mr. Speaker, Sir, this petition was presented to the Office of the Clerk. He went through it and marked it to the Speaker of the National Assembly. The Office of the Speaker of the National Assembly marked it to Mr. Ndombi who is in the legal arm of Parliament. Mr. Ndombi invited me to his office. We went through this petition and I am glad to confirm that we have complied to the letter, to the requirements of that Standing Order.

**Mr. Speaker:** Can you, please, let me have a look at the petition to be satisfied that those steps have been taken?

**Dr. Khalwale**: Mr. Speaker, Sir, after I conclude or before?

**Mr. Speaker**: Before! I must be satisfied. It is the requirement of the Standing Orders! Table it!

*(Dr. Khalwale laid the document on the Table)*

Just hold your horse! Let me be satisfied that those motions have been complied with.

Dr. Khalwale, while you are on your seat, I have as yet to be satisfied. What I see noted on the petition are the following: Note number one is PLC, which stands for Principal Legal Counsel. It reads: "Please go through and advise the hon. Speaker, signed, Patrick Gichohi, Clerk of the National Assembly on 23rd February, 2010. Then from the PLC to Mr. Ndombi: Please deal! It is signed by PLC on 2nd March, 2010. There is nothing further beyond those prescriptions on the petition. So, that, therefore, means that the Clerk has not vetted it and I have not yet been advised. So, to that extent, I am afraid, Dr. Khalwale, that the House must be facilitative, including the Speaker. Let those steps be taken and you can table this petition, maybe, as early as next week.

**Dr. Khalwale:** Mr. Speaker, Sir, thank you but, so that I do not look like I am misleading the Chair, I would like it to go on the HANSARD that, yes, indeed, all the consultations that I have told you about have been done. I had gotten actual direct assurance from both the Clerk and the legal arm of Parliament that this matter had been cleared for today. So, if they forgot to mention it to you, then that should not be visited on me. If there should be any sanctions, they should be against those officers. Thank you! I will comply and on Thursday next week, I will present my petition.

**Mr. Speaker:** Thank you, Dr. Khalwale, for your understanding in this matter. But the rule of thumb in interpretation and as a matter of law is that a document speaks for itself. What I have read out to the House are endorsements to the document which speak for themselves. What you are now stating are matters that are oral and not recorded on this document. There would be no sanctions against you but it is important that we live within the spirit and intention of the Standing Orders. I am glad that you understand and can, therefore, proceed with this petition as early as Tuesday next week.

**Dr. Khalwale**: Most obliged.

**Mr. Speaker:** Next Order!


# PAPERS LAID

The following Papers were laid on the Table:-

Annual Report by the Attorney-General in the State of the Prosecution of Anti-Corruption and Economic Crime Related Cases Pursuant to Section 37 of the Anti Corruption and Economic Crimes Act, No.3 of 2003 for the period 1st January, 2009 to 31st December, 2009.

The Fourth Quarterly Report of the Kenya Anti Corruption Commission for the Year 2009 covering the period 1st October to 31st December, 2009.

*(By the Attorney-General)*

### QUESTIONS BY PRIVATE NOTICE

CANCELLATION OF 2009 KCSE CHEMISTRY PAPER
IN KAPLONG GIRLS SECONDARY SCHOOL

**Dr. Laboso:** Mr. Speaker, Sir, I beg to ask the Minister for Education the following Question by Private Notice.

(a) Could the Minister explain the circumstances  that led to the cancellation of the 2009 KCSE Chemistry Paper 3 (practicals) examination results of Kaplong Girls Secondary School?

(b) What is the fate of the students concerned?

**The Assistant Minister for Education** (Prof. Olweny): Mr. Speaker, Sir, I beg to reply.

(a) During the 2009 Kenya Certificate of Secondary Education (KCSE), 78 candidates from Kaplong Girls Secondary School colluded in the Chemistry Paper 3. Subsequently, their results were cancelled as a result of this examination irregularity.

(b) The fate of the 78 students involved in examination irregularities in Kaplong Girls Secondary School will be decided after the Kenya National Examination Council completes its investigations and determines the school's appeal.  The school has appealed.

**Dr. Laboso:** Mr. Speaker, Sir, while I appreciate the answer given by the Assistant Minister, I would wish to ask him whether proper investigations were instituted and what criteria was used to determine the culpability of the affected school.

**Prof. Olweny:** Mr. Speaker, Sir, the Kenya National Examinations Council relies on the report that comes from the examination station. A report always comes from where the examination is given with the scripts. The action the KNEC took was based on that report. At the moment, there are further investigations taking place because the school has appealed. The appeal of the school is being handled and the outcome will be known once everything is done.

**Mr. Lagat:** Mr. Speaker, Sir, these examinations are normally managed by the Kenya National Examinations Council through the teachers. What action will the Assistant Minister take against the teachers who might have participated in this collusion?

**Prof. Olweny:** If a teacher is found to be involved in the collusion, disciplinary measures will be taken against him or her. As of now, investigations are ongoing. Even the candidates can collude alone without involving the teachers. They can do it on their own in the examination room. It does not have to involve the teacher but there are some cases where the teacher is involved. If it is proved that the teacher is involved, then disciplinary measures will be taken against that teacher.

**Mr. Abdirahman:** Mr. Speaker, Sir, cancelling examinations is not a solution as these problems are now widespread. Even rural schools are actually affected. It appears the students are not very well prepared. Besides investigating and punishing a few teachers, what long-term measures is the Ministry planning to take?

**Prof. Olweny:** Mr. Speaker, Sir, a number of methods have been put in place that have helped us reduce the number of irregularities. One of the long-term solutions to this problem has already been discussed in this House; that is proper identification of the

candidates. That is why the birth certificates which have been causing a problem to some of us are being introduced. It will help solve the problem in the long-term.

**Mr. Imanyara:** Mr. Speaker, Sir, the Assistant Minister has told us that investigations have not been carried out, yet steps have been taken with finality. You have cancelled results rather than withholding results pending investigations. Could you give this House assurance that these investigations that you will do are not designed to rubberstamp a decision that has already been taken? If the investigations were truly genuine, you would not have cancelled the results before the results of the investigations are known.

**Prof. Olweny:** Mr. Speaker, Sir, if the investigations reveal to us that the irregularities reported were not as they are reported, then the cancellation of the results will be revoked. But if they are confirmed, then the cancellation will remain as it is. That is why the school has appealed---

**Mr. Koech:** On a point of order, Mr. Speaker, Sir. Is the Assistant Minister in order to refuse to answer the question, that is: If investigations are going on, why did he cancel the results instead of withholding them until the outcome of the investigations?

**Prof. Olweny:** Mr. Speaker, Sir, cancellation was based on the report that came from the examination station. If the candidates felt that the action against them was not fair enough, it was up to them to appeal. They have appealed and that is why we are doing further investigations to confirm. They have presented their case and the Kenya National Examinations Council has also presented its case. So, we are doing further investigations to confirm what happened.

**Mr. Kigen:** Mr. Speaker, Sir, if the Ministry's action was based on the report from the school, then it means that, that report was conclusive. If it was not conclusive, why did the Ministry take this kind of action before investigations were concluded?

**Prof. Olweny:** Mr. Speaker, Sir, first, there is a report that So and So committed a crime related to the examination. Then the KNEC has to act. We cannot wait---

**Mr. Imanyara:** On a point of order, Mr. Speaker, Sir. Is it in order for the Assistant Minister to say that the crime was committed and then proceed to say that investigations to establish whether a crime was committed are being conducted? Is he in order to say that when the Attorney-General is sitting next to him, who can give him proper legal advice as to the rules of natural justice? He should not mislead this House that they are conducting investigations after the Ministry has already taken conclusive measures by cancelling the results.

**Prof. Olweny:** Mr. Speaker, Sir, there is no way we could release the results that there was an indication that there was an irregularity. In this country, if someone is suspected of committing a crime, he is arrested pending investigations and being arraigned in court. This is a similar thing.

**Mr. Speaker:** Order, Mr. Assistant Minister! Get some counseling from the Attorney-General! A crime is not committed until it is proved.

**Mr. Mwangi:** Mr. Speaker, Sir, this is a very serious issue. For the KNEC to have cancelled the results of these candidates, it must have carried out investigations to arrive at the decision that these students had cheated. Is it in order for the Assistant Minister to have taken the decision and then tell us that they are carrying out investigations? The cheating of examinations involves more than the students. It involves the invigilators and the officials concerned. He must have interviewed these people to have arrived at this

decision. How sure is he that the investigations being conducted will reveal a different scenario from what they have done?

**Prof.   Olweny:** Mr. Speaker, Sir, the investigations that I have said are being conducted will either confirm or not confirm the preliminary report which was used to take the action that was taken against those candidates.

**Dr. Khalwale:** Mr. Speaker, Sir, the Ministry of Education is extremely rotten because the Minister, the Permanent Secretary and all the senior officers know that our children---

**Prof. Olweny:** On a point of order, Mr. Speaker, Sir. Is the hon. Member in order to use unparliamentary word on the Ministry? He has said that the Ministry is rotten? Is the word "rotten" parliamentary?

**Mr. Speaker:** Order! The Member for Ikolomani is out of order! You cannot impute improper motive on a public officer, unless you are in a position to immediately substantiate or bring a substantive Motion to have that debated.

**Dr. Khalwale:** Mr. Speaker, Sir, I withdraw the word "rotten", but allow me to replace it with something else. The Ministry of Education is not fresh and it is very incompetent. They know very well that our children sit for eight to nine subjects. If a child has cheated in one subject only, why can the Ministry not use the results of the subjects in which the child has not cheated to grade him instead of bringing his life to a standstill? Why did you not use that method?

**Prof. Olweny:** Mr. Speaker, Sir, that will not be used because it will not be the complete result of that candidate. If the candidate registered for five papers and one of them is cancelled, that means that the results are not complete. The candidate was registered to do the examination properly for five papers. If the candidate's record had irregularities in one paper, then the results are not complete.

**Mr. Koech:** On a point of order, Mr. Speaker, Sir. You have heard the Assistant Minister telling this House that students are graded in five subjects, when the truth is that our students are graded in seven subjects---

**Prof. Olweny:** On a point of order, Mr. Speaker, Sir.

**Mr. Speaker:** Order, Assistant Minister! The Member is on a point of order!

**Mr. Koech:** Mr. Speaker, Sir, is the Assistant Minister in order to mislead the House?

**Prof. Olweny:** Mr. Speaker, Sir, I gave an example. I did not say that students are graded in five subjects in this country. If a student has registered to---

**Mr. Speaker:** Order, Mr. Assistant Minister! You have done well.

**Mr. Cheruiyot:** Mr. Speaker, Sir, what is coming out of the Assistant Minister's statement is clear; that, the Ministry cancelled the results on basis of suspicion. Could he consider reinstating all the results that were cancelled?

**Prof. Olweny:** Mr. Speaker, Sir, the reinstatement or the cancellation of the results as they are today, will depend on results of the appeal which the school submitted to the KNEC. So, just give us time. The results will be out very soon.

**Mr. C. Onyancha:** Thank you, Mr. Speaker, Sir, for noticing me at last.

**Mr. Speaker:** Order, Member for Bonchari! You do not give any directions or instructions to the Speaker. Proceed!

**Mr. C. Onyancha:** My apologies, Mr. Speaker, Sir. Could the Assistant Minister tell us what happened to the investigations that he was carrying out in respect to the

results for 2008 and the previous years? Year in, year out, we hear the same story that investigations will be carried out. Secondly, who takes responsibility? Is it the student who do the  examination or the KNEC, which is unable to supervise the sitting of examinations?

**Prof. Olweny:** Mr. Speaker, Sir, that is another Question because I will have to go and bring the results of any investigations that we have had before. That is not part of this Question.

**Dr. Eseli:** On a point of order, Mr. Speaker, Sir. This issue of examination results seems to be a recurring problem. Despite your previous ruling that any Committee can take up any matter, I would like you to make a ruling that this matter be referred to the Departmental Committee on Education, Research and Technology to deal with it comprehensively. This issue is recurring and children are being left not sure of their future.

**Mr. Speaker:** If that Committee is discharging and addressing itself to its mandate effectively, then given that this is a matter of national concern, and a matter that is so topical and current, I expect that the Committee has already commenced investigations. So, I will not make that directive.

**Mr. Koech:** Mr. Speaker, Sir, I am the Chairman of the Committee. Last year but one, there was serious unrest in secondary schools in Kenya. We tabled a report before this House and it was adopted by the House, in which we had made very clear recommendations on the KNEC. At this point, we would expect the Committee on Implementation to look at it and look at what the Ministry has done about it. We clearly recommended, and this was adopted by this House, that the KNEC should be overhauled.

**Mr. Speaker:** If I apply the rule pertaining to relevance, I am not so sure that I can give any further directions out of your point of order. You can seek recourse to the Standing Orders and seek further action from the Ministry, including bringing a Motion and compelling the Committee on Implementation to take action.

**Mr. Imanyara:** Mr. Speaker, Sir, I heard you advise the Minister to seek the advice of the Attorney-General and he generously agreed. In the circumstances, is it not only right that this Question be deferred until he takes advice from the Attorney-General on the procedure relating to natural justice before coming to answer this Question on your advice?

**Mr. Speaker:** Order! The Minister for Education has liberty to get in touch with the Attorney-General and get advice as may be necessary. I will not defer this Question, but order that this matter appears on the Order Paper again a month hereafter, for the Minister to confirm that he has liaised with the Office of the Attorney-General and taken the necessary action, as recommended by the Committee and advised by the Attorney-General.

Mr. Assistant Minister, are you clear on that direction?

**Prof. Olweny:** Mr. Speaker, Sir, I have gotten the message and it is taken. But I just want to inform the House that we are already using the Report of the Committee on Education. That is why there is a reduction in the irregularities this year---

**Mr. Speaker:** Order, Mr. Assistant Minister! The House will be expecting a lot more out of you when you bring that report.

**Dr. Laboso:** Mr. Speaker, Sir, first of all, I would like to thank you for that ruling; that this Question reappears again on the Order Paper and that the Assistant Minister will have a more comprehensive answer at the time.

**Mr. Speaker:** Not a more comprehensive answer. The Assistant Minister will make a report on what actions he has taken and what advice he has received from the Attorney-General and his compliance with that advice.

**Dr. Laboso:** Mr. Speaker, Sir, thank you for the advice. But as we conclude for today, I would still like to ask the Assistant Minister to confirm that Chemistry Paper III has repeatedly been associated with the highest number of malpractices in the last several years. What is the Ministry doing about this particular paper that has destroyed the lives of many children?

**Prof. Olweny:** Mr. Speaker, Sir, what she is trying to put---

**Mr. Speaker:** Order, Assistant Minister! You must refer to the Member as an hon. Member and not by her sex!

**Prof. Olweny:** Mr. Speaker, Sir, I cannot confirm what she---

**Mr. Speaker:** Order, Assistant Minister! Could you withdraw the word "she" and refer to the hon. Member as "Dr. Laboso" or "Member for Sotik?"

**Prof. Olweny:** Mr. Speaker, Sir, I cannot confirm what hon. Dr. Laboso has said with regard to the Chemistry Paper III---

**Mr. Speaker:** Order, Assistant Minister! Could you withdraw the word "she" in reference to Dr. Laboso and refer to her with respect?

**Prof. Olweny:** Mr. Speaker, Sir, may I withdraw the word "she" that I used to refer to hon. (Dr.) Laboso.

I cannot confirm what hon. (Dr.) Laboso has alleged in connection to Chemistry Paper III.

CAUSE OF DEATH OF FISH IN LAKE NAIVASHA

**Dr. Otichilo:** Mr. Speaker, Sir, I beg to ask the Minister for Fisheries Development the following Question by Private Notice.

(a) Could the Minister inform the House the cause of recent death of fish in Lake Naivasha and reveal the scope of effects on other aquatic life in the lake?

(b) Could the Minister indicate the potential toxic levels of all chemicals used, give trends in the levels of lake pollution or eutrophication in the last ten years and reveal the expected long-term impact on aquatic life?

(c) What mitigation measures is the Minister taking to save the fish and other aquatic life in the lake?

**The Minister for Fisheries Development** (Dr. Otuoma): Mr. Speaker, Sir, before I reply, I want to apologize that I was out of the House and Town and my Assistant Minister who should have been around, unfortunately, had some emergency. He is yet to tell me what kind of emergency he had that made him not come to the House to answer this Question. So, I apologize on behalf of the Ministry.

Mr. Speaker, Sir, meanwhile, I also want to bring to your attention the fact that I had answered this Question to the best of my knowledge last week. Other than just the laboratory results that I have now gotten from the Public Health Laboratory and KEPHIS,

I do not have any other new information to add. I still stand by what I said then. I can only table further information on the laboratory results that we received.

**Mr. Speaker:** Minister, could you confirm whether or not you have supplied the answer to the Member for Emuhaya?

**The Minister for Fisheries Development** (Dr. Otuoma): Mr. Speaker, Sir, 15 copies were sent and the hon. Member seems to have gotten a copy.

**Mr. Speaker:** Very well! Could you then just expound the answer that relates to the laboratory results and we will then move on to supplementary questions?

**The Minister for Fisheries Development** (Dr. Otuoma): Mr. Speaker, Sir, I think as you are all aware, there was a problem in Lake Naivasha, where there was sudden death of fish. I gave reasons as to why there was that sudden death of fish from the preliminary results that we have gotten. The current laboratory results from KEPHIS indicate that there are no toxic chemicals that can justify to be the cause of death of fish. There are also results from the Public Health and Sanitation Laboratory. There is a certificate of analysis here which also does not show that there were any toxic chemicals in the water that could have caused the death of fish. I also have got further information from Prof. Gilbert Ogutu, who published in 1998 the cause of sudden death of fish in the Great Lakes Region in the tropical areas

Just to expound on some of the answers that I gave, I wish to table it here.

*(Dr. Otuoma laid the document on the Table)*

**Dr. Otichilo:** Mr. Speaker, Sir, I wish to take this opportunity to thank the Minister for giving me a very comprehensive and scientific answer to this Question. However, I wish to pose one question to the Minister. As much as it is clear from this that some chemicals, particularly fertilizers emanating from the farms are causing further decomposition in the lake and, therefore, reducing oxygen, why have the farmers not been restrained from letting the chemicals get into the lake? What is he doing to ensure that the chemicals are not released into the lake?

**Dr. Otuoma:** Mr. Speaker, Sir, I think in my earlier answer, I expounded on some of the environmental challenges that the catchment area of Lake Naivasha was facing. We are all very much aware that our Ministry of Environment and Natural Resources and the National Environment Management Authority (NEMA) are already carrying out an audit as part of the long-term actions that were being undertaken by the Government. This audit report is going to be made available. They are investigating the whole catchment area of Lake Naivasha. I am sure a similar Question had been put by a Member of Parliament to the Ministry of Environment and Natural Resources. Once that audit report is out, I will inform my colleague to table its results and the measures being put in place to ensure that the environment is protected.

**Dr. Eseli:** Mr. Speaker, Sir, while I do appreciate the answer given by the Minister, which I believe was quite professional, I would like him to clarify the following: A report by Prof. Gilbert Ogutu of 1982 on the causes of sudden death of fish is about 30 years old. Both of us being professionals, could the Minister clarify whether a report of 30 years ago is still valid today in its entirety or could there be some new causes of sudden death of fish?

**Dr. Otuoma:** Mr. Speaker, Sir, science is not fiction. It is a matter of hard facts. At that time as I indicated in my earlier answer as to the cause of fish death, I had not received the report from Prof. Ogutu.  As I was going through extra literature, I saw similar information and I thought I would be educating this House on this sudden death of fish. It happened in Lake Victoria in 1927. In fact, the research work there is from 1927 and it is still ongoing. So, I was just trying to use it to reemphasize the point.

**Dr. Otichilo:** Thank you, Mr. Speaker, Sir. In his answer, the Minister indicated that the analysis of sample taken is still going on.  I wish to request through the Chair, whether this result can be availed to me for further scrutiny.

**Dr. Otuoma:** Mr. Speaker, Sir, I have already tabled all the laboratory results.

What I said was going on was the environmental audit, which is being undertaken by NEMA and the Ministry of Environment and Mineral Resources. I had also indicated at that time that the Ministry of Public Health and Sanitation had already taken the Municipal Council of Naivasha to court just because of their sewer treatment. So, there are a lot of other activities that are going on. As I said, some activities are immediate and others are long-term.  With regard to the cause of death of fish in Lake Naivasha, I have already tabled all the results.

**Mr. Speaker:** Minister, will you confirm that when that environmental audit is ready you will avail it to the Member of Emuhaya and any Member who may be interested?

**Dr. Otuoma:** Mr. Speaker, Sir, I undertake to do so.

### ORAL ANSWERS TO QUESTIONS

*Question No. 023*

#### CONSTRUCTION OF SURGICAL THEATRE
#### AT GARBA-TULLA HOSPITAL

**Mr. Bahari** asked the Minister for Medical Services:-

(a) when the Ministry will construct a surgical theatre at Garba – Tulla District Hospital; and,

(b) when he will also repair the only ambulance at the hospital, which is in a state of disrepair.

**The Minister for Medical Services** (Prof. Anyang'-Nyong'o): Mr. Speaker, Sir, I beg to answer.

(a) The Ministry has plans to construct a surgical theatre at Garba-Tulla District Hospital in the coming financial year 2010/2011.

(b) The Ministry of Public Works in Isiolo District has carried out a mechanical inspection of the ambulance, a Toyota Land Cruiser and estimated the cost of repair to be Kshs140,000. The Ministry will make a provision to repair the ambulance during the revised Estimates in March/April, 2010.

**Mr. Bahari:** Mr. Speaker, Sir, I want to thank the Minister for the first part of the answer for having a plan to construct a surgical theatre during 2010/2011 Financial Year. I am not happy with the answer given on part "b" of the Question. Could he tell the House the estimated cost of the theatre?

**Prof. Anyang'-Nyong'o:** Mr. Speaker, Sir, the Ministry will budget for that theatre. We will obviously put it up in the course of next year. As far as the exact cost of the theatre is concerned, that should not worry the Member of Parliament. The Ministry is aware that Garba-Tulla is a recently created district curved out of Isiolo District. In Isiolo District, there is a provision for other health facilities. So, provisions for Garba-Tulla District will not be affected whatsoever, with considerations elsewhere.  Further, we know that Garba-Tulla Hospital---

**Mr. Bahari:** On a point of order, Mr. Speaker, Sir. I deliberately asked this question of the cost. In 2008, I asked the same Question and the Minister indicated that they were considering constructing a theatre. He wrote to me in person and assured me that was to be done. You can see he is now avoiding answering my question. If, indeed, he has planned for the theatre and the estimates must have already been forwarded to the Ministry, why is he not able to tell me the estimated cost? Is he in order?

**Mr. Speaker:** Minister that is a genuine concern. You have been asked a simple question, but you appear to be answering it going round in circles.

**Prof. Anyang'-Nyong'o:** No. I am not going round in circles.  For what I know, the theatre will not cost more than Kshs10 million according to the Estimates. But you know that the cost of construction always varies in time. It is quite possible that variation orders could be put in by the contractors by the time the budget comes into place. That was why I was assuring the Member of Parliament that we have made enough provisions for the cost of supplying enough equipment and construction of that hospital. But nonetheless, the estimated cost of doing the theatre is Kshs10 million.

*(Mr. Affey stood up in his place*
*and attempted to talk)*

**Mr. Speaker:** Order! Amb. Affey, that is gross disorder. You cannot address the Speaker before you catch his eye.

I must have an apology. Otherwise, I intend to take action immediately.

**Mr. Affey:** Mr. Speaker, Sir, I apologise.

**Mr. Speaker:** Please, resume your seat. Yes, Member for North Horr.

**Mr. Chachu:** Mr. Speaker, Sir, many patients in northern Kenya die from illnesses that could be treated if they are able to reach the next hospital. Realising that the ambulance that they have is very old, could the Minister consider giving Isiolo South a new ambulance in the next financial year, realising that public transport in that part of Kenya is not an option?

**Prof. Anyang'-Nyong'o:** Mr. Speaker, Sir, the ambulance is not really that old. The ambulance was supplied to the district hospital in the year 2005. The use of ambulances in our district hospitals has not been very good. Quite often, they are put to multipurpose which makes them breakdown rather fast. That is why we are at the moment having a plan to have a national ambulance system which will manage ambulances much better. This ambulance was manufactured in 2005 and allocated to the hospital and is still good enough if we spent Kshs140,000 to repair it.  It is a Four Wheeled Driven Vehicle and it is suited for the terrain and environment in which it is meant to serve.

**Mr. Wamalwa:** Mr. Speaker, Sir, the Minister had made a similar undertaking in 2008 for construction of a theatre at Sabaoti Sub-district Hospital and provide an ambulance.

Mr. Speaker, Sir, we received an ambulance. However, up to now, the theatre has not been constructed. They had indicated that it will cost about Kshs5 million. Mr. Minister, do you really follow up to see whether these plans are actually implemented?

**Prof. Anyang'-Nyong'o:** Mr. Speaker, Sir, I have said quite frequently in this House that the Minister may have very good intentions to satisfy the needs of Kenya, but then the supply side is not responding. The supply side is the Treasury. It is this House that votes money to the Treasury. I would like to appeal to this House that during the coming financial year, to ensure that there is enough money in the budget lines that will give me the power to use the Kshs5 million to construct the theatre in Saboati.

**Mr. Yakub:** Mr. Speaker, Sir, in Lamu District, pregnant women and sick people have been suffering for so long because they do not have a Government ambulance. But the local people have decided to have one. They are the ones who are paying the drive. Could the Minister consider assisting the local people with fuel expenses?

**Prof. Anyang-Nyong'o:** Mr. Speaker, Sir, hon. Yakub has made a very useful proposal. The whole idea of having a national ambulance system is to make sure that the Ministry collaborates with the private sector, including private hospitals such that anybody who can have access to an ambulance anywhere can use that ambulance at the cost of the national ambulance system, so that the Ministry does not depend entirely on its own feet, knowing that its own feet are not adequate; therefore, developing a system whereby ambulances are paid for as they are used. We would encourage people in the private sector, indeed, to have ambulances and to log into our national ambulance system, so that the Ministry can use these ambulances when necessary and pay for them. I have realised if we are going to rely on buying ambulances and giving them to health centres and hospitals, not only is this very inefficient, but it also encourages certain health facilities who do not use these ambulances that frequently to misuse them for other purposes other than health purposes.

**Mr. Bahari:** Thank you, Mr. Speaker, Sir. This Minister is a friend of mine and he was also my lecturer. He is just about to lose that friendship because of the casual manner in which he has handled this Question. I am saying that because the Minister has said that, that ambulance was given to Garba-Tulla in 2005. That is five years ago. I have handled that issue before. After four years, you replace those vehicles. The vehicle in that area travels over 200 kilometers every other day! That is why I am saying that he is very casual in the manner in which he has handled the Question.

In the meantime, Mr. Speaker, Sir, now that travelling abroad for Ministers has been suspended, could he transfer the money that he would have used to go to one of the conferences to repair that ambulance at Kshs140,000, while we wait for a new ambulance that he is going to give us in the next financial year?

**Dr. Nuh:** On a point of order, Mr. Speaker, Sir. Would I be in order to advice hon. Bahari that, instead of asking for travel money, there is some money that was destined for---

**Mr. Speaker**: Order, Dr. Nuh!

*(Laughter)*

You would, certainly, be out of order! Proceed, Mr. Minister!

**Prof. Anyang'-Nyong'o:** Mr. Speaker, Sir, whereas I would willingly allocate the travel money to the hon. Member from Isiolo South, unfortunately, as Ministers, we are not the accounting officers in our Ministries. We are simple servants in those Ministries. So, the hon. Member may have to write to the Permanent Secretary of the Ministry of Medical Services to get that reallocation of travel money channeled to Isiolo South.

Secondly, Mr. Speaker, Sir, the Kshs140,000 is actually available for the repair of the vehicle. I do sympathize with my dear friend – I hope I do not lose his friendship – having given him good education. I am quite sure that the vehicle has been run down because it is serving a very large area. That is one of the reasons why I have promised the hon. Member that, rather than the Ministry relying solely on the ambulances bought and put in medical facilities by the Ministry, we have decided to have a national ambulance system where even the private sector in Isiolo South will partner with us. We shall use their vehicles and pay for them as and when we use them.

*Question No. 047*

STATUS OF NYANYAA WATER PROJECT

**Mr. Nyamai** asked the Minister for Water and Irrigation:-

(a) when the Nyanyaa Water Project was started, when it was supposed to be completed as well as the amount of money spent on the project so far; and,

(b) what steps she is taking to ensure that the project is completed promptly?

**The Assistant Minister for Water and Irrigation** (Mr. Kiunjuri): Mr. Speaker, Sir, I beg to reply.

(a) Nyanyaa Water Project was implemented in three phases as follows: Phase I - Nyanyaa Community Water Project started in 1997 when the Egyptian Government, through the Kenya-Egypt Technical Co-operation Program sited, drilled and equipped Kusyani Borehole in Mandu Village, Lower Yatta District. Under that program, 100 productive boreholes were drilled in the whole country at a cost of US$5 million. The works were completed in 1998.

Phase II – In 1999, the community organized a water committee whose objective was to distribute water from the borehole with the help of the donors. Advent Development Relief Agency (ADRA) Kenya, an international NGO thus replaced the existing submersible pump and generator with a higher capacity set. The DANIDA-funded Kitui Agricultural Program subsequently laid a 2.5 kilometer long, 2 inch rising main and constructed a 54 meters cubed masonry storage tank. Those works were completed in 2005. The total cost of Phase II was Kshs12,551,515.50.

Phase III – In 2006, the County Council of Kitui, through the Tana Water Services Board, sourced for Kshs14,444,684.35 from the European Union and laid another 2.5 kilometer rising main, 10 kilometer long distribution lines to market centres like Tiva, Kalima, Konza, Kalivini and Nyanyaa, constructed, at least, five water kiosks, drilled a new borehole, installed a submersible water pump generator set and community capacity building.  Another new borehole was also sited, drilled, developed in April,

2005, at Kiliko. It is 160-meter deep and yields 3 cubic meters per hour of water. It is intended to serve Kangundo and Kiliko villages. The works were completed in 2005.

(b) My Ministry, through Tanathi Water Services Board, is planning to implement Phase IV of the project in the Budget for the Financial Year 2010/2011. The major works will include the purchase and installation of a submersible water pump and generator set for the second Kiliko Borehole, which is not yet equipped. The remaining works will be completed during the Financial Year 2010/2011.

**Mr. Nyamai:** Mr. Speaker, Sir, I want to thank the Assistant Minister for the answer. However, my issue of concern is on Phase III. But just before I go to that issue, Mr. Speaker, Sir, with your indulgence, that project was started 13 years ago and, up to today, and having pumped more than Kshs20 million, no single drop of water has been supplied by the Ministry. But that notwithstanding, one of the major issues is about the handover of Phase III of the project. The contractor has not handed over the project because there are disputes. He wants to be paid for what the locals provided freely as their contribution. What is your Ministry doing to ensure that, that dispute is resolved and the project is handed over to the community?

**Mr. Kiunjuri:** Mr. Speaker, Sir, that project was implemented by different agencies. The Ministry was only monitoring the progress. Otherwise, issues of procurement, implementation and procedure were being handled by different agencies. They were, sometimes, not willing to share the information with the local communities.

However, Mr. Speaker, Sir, our Ministry is going to make sure that if there are issues preventing *wananchi* from getting water, they will be resolved.

**Mr. Nyamai:** Mr. Speaker, Sir, as the Assistant Minister resolves the dispute there, the scope of that project was done 13 years ago to serve a smaller population then. What is your Ministry doing to expand the distribution line to serve the huge population that has migrated into that area?

**Mr. Kiunjuri:** Mr. Speaker, Sir, that problem will be tackled by Phase IV. I have said that my Ministry, through Tana and Athi Water Services Board, is planning to implement that phase with the funds that we shall receive in the 2010/2011 Financial Year. We are yet to decide how much we shall give to the project. But you can see the history of this project. We have always pumped in over Kshs10 million. So, I do not expect the Ministry to give less than what other agencies have provided.

**Mr. Speaker**: Hon. Evans Akula!

**Mr. Linturi:** On a point of order, Mr. Speaker, Sir.

**Mr. Speaker**: Order, Mr. Linturi! We have moved to the next Question!

**Mr. Linturi:** My point of order is regarding---

**Mr. Speaker**: Order, Mr. Linturi! No, Mr. Linturi! Proceed, Mr. Akula!

*Question No. 123*

RURAL ELECTRIFICATION PROJECTS
UNDERTAKEN IN KHWISERO

**Mr. Akula** asked the Minister for Energy:-

(a) which rural electrification projects have been undertaken in Khwisero constituency from 2002 to date; and,

(b) which projects are planned in the current Financial Year 2009/2010?

*(Applause)*

**Mr. Linturi:** On a point of order, Mr. Speaker, Sir.

**Mr. Speaker**: What is it, Mr. Linturi?

**Mr. Linturi:** Thank you, Mr. Speaker, Sir. With your indulgence, I want to ask whether it is in order for an hon. Member to ask a Question that is obvious in the sense that projects that are implemented by Rural Electrification Authority (REA) originate from hon. Members of Parliament.

But, Mr. Speaker, Sir, in view of the fact that the hon. Member for Khwisero has never made his maiden speech, maybe, I will ask you to use your discretion to give him a chance to thank the people of Khwisero and the Government for implementing that kind of program.

*(Laughter)*

**Mr. Speaker**: Order, Mr. Linturi! Order! Every hon. Member of Parliament is here legitimately following an election, whereby he is elected by voters in his constituency. It is within the discretion of the hon. Member and his prerogative to determine when he will contribute and in what manner he will contribute.

So, your suggestion and, indeed, innuendos as made in your statement are out of order. At any rate, all Questions are approved by Mr. Speaker, and so, this Question can properly be asked. Mr. Assistant Minister, will you, please, answer it?

**The Assistant Minister for Energy** (Mr. Keter): The hon. Member, Evans Bulimo, wanted to know the projects which have been done since 2002. They are as follows; Ebukhlwala Health Centre and St. George Complex (Mushiangubu); Ekambuli Secondary School; Emalindi Complex; Emasatshi Market/Shinutsa Secondary School; Khumailo Market; Khusukuti Market; Luanda Dudi Secondary School; Mundeku Market; Emutsasa Health Centre; Namasoli Health Centre; Nyamwanza Health Centre; Eshiabwari Polytechnic and, Emasatsi/Munjiti.

All these projects have been undertaken at the cost of Kshs31.86 million.

(b) This current Financial Year, 2009/2010, the projects which are to be constructed are as follows: Emulole-Muberi Market at the cost of Kshs3.5 million; Munjiri Market – Eshibinga Secondary School - Kshs2 million; Emanyulia Market-Ekomoo Dispensary - Kshs4.8 million; Khwisero-Ebushiri Market - Kshs4.85 million and Eshinutsa Secondary School-Eshinutsa Health Centre - Kshs0.3 million. This gives a total of Kshs15.49.

The contractors have been identified for the three projects mentioned above. The last two are under survey which should be completed anytime now.

**Mr. Akula:** Mr. Speaker, Sir, I would like to correct the impression created by Mr. Linturi.

**Mr. Speaker:** Order, the Member for Khwisero! I have given directions on that matter and let it rest there.

**Mr. Akula:** Mr. Speaker, Sir, how many projects is the Ministry supposed to do in every constituency per year? For the last eight years, they have done only 11 projects which translates to an average of one project---

**Mr. Mbadi:** On a point of order, Mr. Speaker, Sir. With your indulgence, the issue of a Member making a Maiden Speech is very critical. If Mr. Linturi made an allegation that the Member for Khwisero is making his Maiden Speech and yet he has spoken in this House before, I think that is a very serious issue that needs to be corrected. The information I have from the hon. Member is that he is not making his Maiden Speech. Was the Member for Igembe South in order to impute improper motive on his colleague?

**Mr. Speaker:** Order, the Member for Gwassi. Why would you raise that concern too late; long after I have given directions on the issues canvassed by Mr. Linturi?

**Mr. Mbadi:** Mr. Speaker, Sir, I thought that the hon. Member would have an opportunity to do that, but given your ruling just a few minutes ago, I thought the hon. Member was going to be inconvenienced, hence my raising it.

**Mr. Speaker:** You think the Member for Khwisero does not have the capacity to stand his own ground?

Continue, the Member for Khwisero!

**Mr. Keter:** Mr. Speaker, Sir, the Member for Khwisero wanted to know how many projects are being done every year. Before the last two financial years, the allocation of the Rural Electrification funds was not done the way we are doing it now. Currently, we are using the CDF formula.

The hon. Member will realise that in this financial year, he will get over Kshs15 million and we are doing about five projects. In the last financial year, he also got the same amount of money, that is, Kshs15 million which did three projects. Right now, the Ministry of Energy allocates funds using the CDF formula.

**Dr. Nuh:** Mr. Speaker, Sir, since there are many constituencies in this Republic which do not have the national grid - they do not have even a single power line, what does the Assistant Minister intend to do to offset this imbalance that is within the constituencies?

**Mr. Keter:** Mr. Speaker, Sir, what we have done in areas like North Eastern Province is that we have allocated them about Kshs600 million. In the last financial year, we did six projects in six constituencies. We provided them with generators which cost about Kshs100 million each. We will do the same thing this financial year. We have also embarked on interconnections. For example, by next month, Moyale Town will be connected from Ethiopia.

**Mr. Speaker:** Dr. Nuh, is your point of order still necessary?

**Dr. Nuh:** Mr. Speaker, Sir, I just wanted to correct the Assistant Minister because he might have had the perception that I come from North Eastern Province and that is why, perhaps, he was replying. I want to remind him that I come from Bura which is in Coast Province.

*(Mr. Keter stood in his place)*

**Mr. Speaker:** Order, Mr. Assistant Minister! I do not see anything that you should address there. You have just been advised and reminded.

*(Mr. Langat stood up in his place)*

Order, Mr. Langat! You have not caught the Speaker's eye.

Mr. Magerer!

**Mr. Magerer:** Mr. Speaker, Sir, what measures has the Assistant Minister put in place to ensure that some constituencies which are larger and require more money than the average Kshs16 million that he gives--- I would like to know whether he has a special fund for those constituencies, especially Kipkelion?

**Mr. Keter:** Mr. Speaker, Sir, we have completed a master plan for the whole country, whereby we have done a plan for all the public utilities. Currently, there are about 8,000 to 9,000 public facilities. Therefore, that will be done in the next allocation because some of the constituencies have already completed some of the public facilities. The money will go to those constituencies with many public facilities.

**Mr. Akula:** Mr. Speaker, Sir, could the Minister explain to this House or the people of Khwisero why no project has been undertaken to date with regard to the five projects for the year 2009/2010?

**Mr. Keter:** Mr. Speaker, Sir, I thought I said with regard to the five projects for this Financial Year, 2009/2010, the first three have been awarded to contractors while the last two are under survey and design. I want to assure the hon. Member and the people of Khwisero that the five projects will be completed this year.

We have had a problem with transformers. Vandalism has caused us a lot of problems. However, I want to assure this House that already, we have new transformers. The Rural Electrification Authority (REA) is waiting for transformers of 11KVA which it will receive by mid next month. So, most of the projects will be energized and commissioned, including these ones.

**Mr. Speaker:** Hon. Members, that brings us to the end of Question Time.

Next Order!

**Mr. Gabbow:** On a point of order, Mr. Speaker, Sir.

**Mr. Speaker:** Order, Mr. Gabbow! I am aware that you have put me on notice that you want to rise on a point of order, but this is not the opportune moment.

Next Order!

# MINISTERIAL STATEMENTS

## MURDER OF PEOPLE IN KIRINYAGA DISTRICT

**The Assistant Minister, Ministry of State for Provincial Administration and Internal Security** (Mr. Ojode): Mr. Speaker, Sir, on 16th March, 2010, Ms. Martha Karua, the Member of Parliament for Gichugu, rose on a point of order and sought a Ministerial Statement on the murder of four people in Kirinyaga District. The hon. Member wanted to know the circumstances surrounding the murder of four people in South Ngariama Ranch, the number of people killed in that area since 2008, whether the culprits have been brought to book and what the Minister was doing to secure the larger Kirinyaga District.

On the night of 15th-16[th] March, 2010, a gang of unknown number of people attacked and murdered the following male adults in South Ngariama Settlement Scheme within Kirinyaga District: Joseph Kinyua Kiragu, 40 years old, Murimi Mugane Ndonge, 70 years old, Joseph Kariuki Jakenda, 51 years old and, James Kariuki Kanja, 35 years old.

The bodies of the victims were found outside their houses by family members and neighbours. A report was made to the police on 16th March, 2010, at 9.00 a.m. The police visited the scenes and commenced investigations immediately under Police Case File No.225/81/2010.

Mr. Speaker, Sir, concerning other incidents of murder since 2008 within the same area, the following cases are still pending in court or pending under investigation:-

1. Police CR No.221/432009 and Court Criminal Case No.328/2009: Offence, murder; Diseased, Esther Wanjiku, Susan Kirunde and Munene Mbugua. Position as at now: Pending before court. The accused are Kamau Mwaura, Mwaniki Nyamu, Murithi Nyamu, Gichohi Gathai, Muchiri Njoka, Mitamo Ndung'u, Wachira Gichina, Murithi Karioki and Murage Karioki.

2. Police File No.221/27/2009 and Court Criminal Case No.72/210: Offence: Incitement to violence. Position as at now: Pending before court. Accused: Samuel Murithi Njeru; Circumstances: Accused was a suspect in the murder case above, but evidence was inadequate. A case on incitement to violence was preferred against him where evidence was enough to sustain prosecution.

3. Police Case No.221/182010: Offence, murder on the night of 19th-20[th] February, 2010 at Kirumwinga/Kimingaere; Deceased: Wilson Wangu Kabaru; Position: Pending under investigation.

4. Police Case No.221/312010: Offence, murder on the night of 3rd – 4th February, 2010 at Kaitheri; Deceased, Magdalene Indicia; Position: Pending under investigation.

5. Police Case No.221/37: Offence, murder on the night of 13th – 14th February at Murungeri: Deceased, Patrick Ngungu; Suspect: Peter Wachira Mugo, who is diseased; Kennedy Njeru, who is also diseased; Andrew Girigi, who was ordered released by the Attorney-General's Office; Position: Pending under investigations.

*(Loud consultations)*

**Ms. Karua:** On a point of order, Mr. Speaker, Sir. The consultations are so loud that I can hardly hear what the Assistant Minister is saying.

**Mr. Speaker!** Order, hon. Members! Could you, please, lower the level of your consultations, so that the Assistant Minister can be heard?

**The Assistant Minster, Ministry of State for Provincial Administration and Internal Security** (Mr. Ojode): Mr. Speaker, Sir, details of the final case are as follows:-

6. Police Case No.223/30/2010: Offence: Murder on the night of 9th – 10th March, 2010 at Sagana; Deceased, George Mugambi, taxi man; Suspects: Patrick Mwangi Gitahi, Anthony Thambiri Mwaniki and James Kanyui Ngatha. Position: Pending before court.

Mr. Speaker, Sir, on the most recent incident, three suspects, namely, George Njeru, Francis Kabanga and Michael Munya were arrested and are helping the police with investigations. More suspects are likely to be arrested. Unfortunately, this may also include a Member of this House.

The name of the particular hon. Member has been adversely mentioned in our investigations and he will have to record a statement with the police. In the meantime, I trust that the police will be fair in their investigation. I want to confirm that that Member of this House has so far been arrested as we are seated here.

Mr. Speaker, Sir, as a result of these incidents, the following measures have been put in place to restore peace and security in that particular area:-

(i) public security meetings have been held within the affected areas;

(ii) involvement of the local communities through community policing which has led to the arrest of several suspects;

(iii) patrols have been stepped up and security beefed up within Kerugoya town and its environs to bring calm, with the deployment of two platoons of General Service Unit (GSU) and Administration Police (AP) officers to boost security;

(iv) four police patrol bases have also been established in Itangi, Karimandawa, Ikiringu and Kwa Mamadidi;

(v) the local council has also been requested to issue allotment letters to individuals to develop markets within the settlement schemes;

(vi) I have also instructed the District Commissioner (DC) and the local leaders to forward a list of proposals on creation of administrative units to enhance security.

Mr. Speaker, Sir, we do not allow impunity and killing of innocent people by anybody, even if it is one of us.

Thank you.

**Mr. Speaker:** I will allow three hon. Members to seek clarifications, beginning with the Member of Parliament for Gichugu.

**Ms. Karua:** Mr. Speaker, Sir, I want to thank the Assistant Minister for that very comprehensive answer and for the action taken so far. What is he doing about threats issued by the same prominent politicians, to the effect that voters will not be registered in Murinduko South Ngariama Ranch area? Secondly, what is he doing to ensure that there will be security tomorrow, when the burial of the four people who were murdered will be taking place?

**Mr. Speaker:** Is there anybody else who is interested? Assistant Minister, please, take notes.

**Mr. Njuguna:** Mr. Speaker, Sir, as the Assistant Minister has very ably responded to these very serious security threat in Ngariama Ranch, I would ask him to indicate to this House what assistance he is extending to those families whose houses have been destroyed. What specific measures is he putting in place to guarantee the safety of citizens in that area?

**Mr. Speaker:** Mr. Assistant Minister, you may respond!

**The Assistant Minister of State for Provincial Administration and Internal Security** (Mr. Ojode): Mr. Speaker, Sir, the burial will be done tomorrow and the presence of the Government will be felt on the ground. I would like to say---

*(Laughter)*

**Mr. Mwangi:** On a point of order, Mr. Speaker, Sir. Could the Assistant Minister explain to the House what he means when he says: "The Government will be felt on the

ground"? The experience we have had is that when people go to bury their own, they are beaten up by the police. Is that the force he wants us to experience?

**Mr. Speaker:** Order, the Member for Kiharu! That is not a valid point of order!

Mr. Assistant Minister, proceed! Ignore that point of order!

**The Assistant Minister of State for Provincial Administration and Internal Security** (Mr. Ojode): Mr. Speaker, Sir, I want to assure the people of Kirinyanga that they will see the presence of the Government tomorrow at the burial. In fact, if I get time, I might also attend the burial ceremony.

Mr. Speaker, Sir, with regard to voter registration, I want to assure the hon. Member that the voter registration will go on smoothly as it is in any other area. There should be no cause for panicking at all.  Currently, I have dispatched quite a number of security personnel and you will hear no problem from the ground.

I would like to assure hon. Members that they should go about their businesses as usual and as if nothing happened. We will continue to arrest the suspects.

Mr. Speaker, Sir, I support my colleagues that nobody is allowed to kill. Nobody is allowed to hire goons to kill anybody because they are not above the law.

**Mr. Ngugi:** On a point of order, Mr. Speaker, Sir. I have observed this Assistant Minister. Most of the time, he is gesturing and pointing a finger even at the Speaker. I have been wondering whether this is acceptable.

*(Laughter)*

**Mr. Speaker:** Order! The Member for Kinangop, sometimes the Assistant Minister of State for Provincial Administration and Internal Security gets carried away, particularly when he wants to be passionate about matters. However, I have cautioned him previously that pointing a finger at another person, particularly if that person apprehends danger, amounts to assault and that he may be liable to arrest and prosecution.

So, Mr. Assistant Minister, please take note of that!

*(Laughter)*

**The Assistant Minister of State for Provincial Administration and Internal Security** (Mr. Ojode): Mr. Speaker, Sir, there is no need to panic. You are safe and all Members of Parliament are also safe.

Mr. Speaker, Sir, I have another Ministerial Statement I need to make. It was requested by my friend, Mr. Gitobu Imanyara. It is not as serious as this one of Ms. Karua.

**Mr. Speaker:** What is it about?

WITNESS PROTECTION FOLLOWING BREAKAGE
INTO OFFICES OF ICPRCR

**The Assistant Minister of State for Provincial Administration and Internal Security** (Mr. Ojode): Mr. Speaker, Sir, Mr. Gitobu Imanyara sought a Ministerial

Statement on witness protection and in particular, the breaking into the offices of ICPRCR(?).

**Mr. Speaker:** Order! The nature of urgency in that matter is such that we can deal with it on Tuesday next week. This is because of the magnitude of the matters before the House this afternoon.

Can we do that on Tuesday?

**The Assistant Minister of State for Provincial Administration and Internal Security** (Mr. Ojode): Most obliged, Mr. Speaker, Sir.

**Mr. Imanyara:** On a point of order, Mr. Speaker, Sir. Is it correct for the Assistant Minister to say the matter is not as serious when we are talking about potential death of witnesses who are likely to give evidence to the International Criminal Court (ICC)?

**Mr. Speaker:** Order, Mr. Imanyara! We have said so, only in relative terms. As a good lawyer, you know what that means. If you parallel that against the comprehensive review of the Constitution, of course, you will decide on your scale which is of greater urgency.  However, it is obviously an important matter, it is serious and we will address it on Tuesday afternoon.

Mr. Imanyara, let it rest there!

IMAGE OF FEMALE MEMBERS OF PARLIAMENT'S LEGS

**Mr. Gabbow:** On a point of order, Mr. Speaker, Sir.

**Mr. Speaker:** What is it, Mr. Gabbow?

**Mr. Gabbow:** Mr. Speaker, Sir, I rise on a point of order under Standing Order No.34 on broadcasting regulations. Section 5(2) says:-

"Shots designed to embarrass unsuspecting Members of Parliament shall not been shown"

(3) Recordings of Parliamentary proceedings may not be used for purposes of political party advertising, ridicule, commercial sponsorship or any form of adverse publicity".

I understand that T*he Standard* Newspaper has shown an image of our female Members of Parliament's legs.  It has advertised---

**Mr. Imanyara:** On a point of order, Mr. Speaker, Sir.

**Mr. Speaker:** Order, the Member for Imenti Central! Allow the Member to complete his point of order!

Mr. Gabbow, please, proceed!

**Mr. Gabbow:** Mr. Speaker, Sir, this is a picture from *The Standard* Newspaper that was carried on *crazy Monday.* It shows the "nude" legs of our lady Members of Parliament.

*(Laughter)*

Let me finish!

**Mr. Speaker:** Order, hon. Members! Let us hear Mr. Gabbow!

**Mr. Gabbow:** It is not nude legs---

**Mr. Speaker:** Order, hon. Members! Hon. Gabbow, could you address the Chair?

**Mr. Gabbow:** Mr. Speaker, Sir, I would like to make a correction. It is bare legs. I would like to lay this picture on the Table.

*(Mr. Gabbow laid the document on the Table)*

Mr. Speaker, Sir, could you give direction or a ruling on this matter?

**Mr. Imanyara:** On a point of order, Mr. Speaker, Sir. Could the Member declare his interest in the matter since it is not the ladies who are raising the issue?

*(Laughter)*

**Mr. Speaker:** Order, hon. Members! Mr. Gabbow, do you have any interest in this matter that is personal?

**Mr. Gabbow:** As a Member of Parliament "Yes". I am a law protector and part of the Standing Orders---

**Mr. Speaker:** Order! I asked you a specific question. Do you have any personal interest?

**Mr. Gabbow:** Mr. Speaker, Sir, I do not have any personal interest.

**Mr. Speaker:** That is good enough!

The Member for Gichugu, proceed!

**Ms. Karua:** Mr. Speaker, Sir, it is regrettable that this matter is being trivialised. I do not think according to our Standing Orders, the media can selectively use photos of Members of Parliament and selectively use parts of their bodies to sensationalize their reporting. Next time, we do not know whether it will be the mirrors that they will drop as we pass as schoolboys used to do.

*(Laughter)*

Mr. Speaker, Sir, this is a very serious matter. It is about the dignity of this House and its Members. I think that it is a matter that deserves your direction. We appeal to our colleagues in Parliament, both male and female, to take the matter seriously. This can get a little bit far.

The privilege of reporting in the House carries the responsibility with it. This is the responsibility that is not being shown in this photo. We crave for your directions in the matter.

**The Minister for Higher Education, Science and Technology** (Dr. Kosgei): Mr. Speaker, Sir, I would like to thank the Member for raising this matter because if we had raised it, as women, there would have been an issue. It appears as if the media assisted by some people would like to trivialize the position of women in this country. We come here to represent people. We come here to use our mouths and brains to get Kenya to move forward. Therefore, it is extremely offensive to publish pictures of women's legs. We are not ashamed of parts of our bodies but this is wrong. This is sexist and it must not happen in this House or in this country while we are here.

*(Applause)*

**Mr. Speaker:** Member for Mumias!

**Mr. Washiali:** Mr. Speaker, Sir, photographs or no photographs, do you think it is fair for our colleagues, lady hon. Members, to put on short dresses? We also get confused as Members of Parliament when we are here.

*(Several hon. Members stood up in their places)*

**Mr. Speaker:** Order! Order, hon. Members!

**Mr. Gunda:**   On a point of order, Mr. Speaker, Sir. I have not seen that photograph but can we be told whose legs those are?

**Mr. Speaker:** Order! What is it Rt. Hon. Prime Minister?

**The Prime Minister** (Mr. Raila): Mr. Speaker, Sir, I have been privileged to look at these pictures and the captions. I think it is important for hon. Members to know  the content of what is written here. Elsewhere in this pull out, there is the "*Eyedentity Quiz*", which is predicated on the assumption that people's eyes have a distinct personality. Nobody has ever thought of running a "*Legdentity Quiz"* though. A prize for whoever can correctly identify the owners of these pairs of legs. Clue: The picture was taken in Parliament.

Mr. Speaker, Sir, this is very repugnant and nothing could be more demeaning than what is contained in this thing here. The dignity of this House has been lowered extremely by this kind of coverage and, therefore, I do not know what you are going to rule. I think the media has responsibility to respect the House and to ensure that the dignity of this House is not lowered. I would therefore urge that you make a ruling which will uphold the dignity of the House.

**Mr. Speaker:** Hon. Ms. Odhiambo!

**Ms. Odhiambo:** Thank you Mr. Speaker, Sir. At the onset, I would want to say that I am not ashamed of my legs and in relation to what the hon. Member for Mumias has actually said. I have a right under the Constitution to wear even a mini skirt if I want. However, what Ms. Karua has raised is that when you look at it from a sexist perspective; when we are presenting issues in this House, what I bring into the House is not my legs, but my head and my brains. Therefore, this is lowering the dignity of the House.

When Ms. Karua and I were attending the PSC retreat in Naivasha, we had very valid contributions, but what was covered in the newspapers was the same issue. The public was asked to check and give their views on what we could be discussing. One of the views was that we could have been discussing the constitutionally acceptable length of a skirt. The constitutionally acceptable length of a skirt is any that is acceptable to me as a person because I have those rights. But when I am discussing as a Member, I want you to get my view on devolution. Otherwise, it is sexist, discriminatory and is against Section 82 of the Constitution.

**Mrs. Shabesh:** Mr. Speaker, Sir, I would like to first register my disappointment and also to ask: Is it not obvious that the journalist who took those pictures is a male chauvinist and should not be allowed into this House anymore?

**Mr. Muiru:** Thank you Mr. Speaker, Sir. The press has always claimed that we muzzle it whenever we try to register or to legislate any law that governs their conduct. Fortunately, some of us have been on their defence to have that democracy. This means that the democracy has been extended too much and they have written too much. Maybe,

in your ruling, it is also necessary that their behaviour not only in the picture taking, is also chequered within our precincts here. In fact, they are likely to talk or even to turn to their own colleagues to start taking photographs when they have finished with us.

**The Minister for Special Programmes** (Ms. Shaban): Mheshimiwa Spika, ningependa kuzungumza juu ya swala hili ambalo limetatiza akina mama wote nchini Kenya. Inaonekana ya kwamba, waandishi wa magazeti, ijapokuwa wamepatiwa uhuru wa kuandika na kuonyesha vile maswala ya Kenya yanavyoendelea, hawaheshimu akina mama Kenya hii, hawaheshimu watoto wao wa kike, wala hawaheshimu dada zao. Kwa hivyo, uhuru tumewapatia wawe wakiwatukana akina mama ambao ni Wabunge. Sisi ni Wabunge ambao tuna haki kama Wabunge wengine wote.

**Mr. Speaker:** We will take just two more, beginning with the hon. Minister for Foreign Affairs.

**The Minister for Foreign Affairs** (Mr. Wetangula): Mr. Speaker, Sir, this third picture goes beyond just the picture. I think in your ruling, I want to urge you to go beyond that picture. Rules of etiquette in comparable jurisdictions the world over; live broadcasts in Parliament normally focus on the Chair and the Member on the floor. In this House, we have seen many times, cameras only focusing on Members who are resting their eyes; I do not want to say dosing. They also focus on Members who are stressed, just to show a bad picture of hon. Members. In this evolution of using live coverage, I think you need very clear rules. If you go to Australia or the UK and everywhere else, it is the Chair and the Member on the Floor, unless some incident happens that requires attention. I think you also need to go beyond just this absurd photograph that I was abhorred to see in the newspapers. Had the hon. Member not raised the issue, I was also carrying a copy to raise it.

**Prof. Kamar:** Mr. Speaker, Sir, it is only a few months ago when you allowed the media to interact with this House and we are seeing abuse already. In your ruling, I would like you to consider not just what should be done to the reporter who came to the House but also the media company, because before anything is published, it goes through an editor. We want you to set precedence, so that this kind of abuse of a privilege that was given to the media will not be abused again. Let those who are doing a good job be applauded and let those who are messing us up be dealt with.

We beg a very fair ruling from you Mr. Speaker, Sir.

**Mr. Speaker:** Order hon. Members! Member for Wajir North who raised this matter, will you please help the Chair; can you be categorical on which newspaper carried this picture and the page of that newspaper?

**Mr. Gabbow:** Thank you Mr. Speaker, Sir. This was carried in the *East African Standard* newspaper, Page 6, *Crazy Monday*, on March 22, 2010.

**Mr. Speaker:** Hon. Members, I have allowed that level of canvassing on this matter because I consider it serious and meriting a comprehensive ruling. But *prima facie,* hon. Members, that story and picture as carried by the newspaper which has been mentioned is repugnant to morality and applying the taste of a reasonable man, offends ordinary decency.

I, however, will make a comprehensive finding and give directions on Tuesday next week in the afternoon.

*(Applause)*

## COMMUNICATION FROM THE CHAIR

### DEADLINE FOR SUBMITTING PROPOSED AMENDMENTS

**Mr. Speaker:** Hon. Members, before we move to the next Order, I have this Communication to make. On Tuesday, 23rd March, 2010, at the beginning of the debate on the Motion to approve the draft Constitution, I ordered that proposed amendments that will have been submitted by yesterday, Wednesday, 24th March, 2010, will be considered beginning this afternoon. Since then, my office has received many proposed amendments, 19 of which appear in today's Order Paper and a lot more are under process by the Parliamentary Legal Department. In view of the above, I have reflected on the best way of handling these amendments and decided that all the proposed amendments be disposed of on Wednesday, 31st March, 2010 in the Morning and Afternoon Sittings in sequential order in which the Articles and Schedule appear in the draft Constitution. Hon. Members who have submitted the proposed amendments will be given an opportunity to move them and after the same are seconded, a brief debate will follow before we proceed to Division. In view of the constitutional requirement that no alteration can be made to this draft Constitution unless such alteration is supported by the votes of not less than 65 per cent of all the Members of the National Assembly excluding the *ex-officio* Members, I wish to reiterate that any amendment that fails to obtain the requisite numbers after the Division Bell has been rung shall be deemed to be negatived and the House shall immediately move to consider other amendments.

All hon. Members wishing to submit amendments for consideration by the House should do so by 4.00 p.m. on Tuesday, 30th March, 2010. This time is not liable to extension. Time is, therefore, of essence.   Please note: That is because the earlier directive has already been breached because, even as I make this Communication, I am informed there are hon. Members waiting in the Clerk's office to submit amendments. So, we will not have really met the deadline as previously set. But the deadline now given is 4.00 p.m. Tuesday 30th March, 2010  and it will not be extended.

Thank you!

**Mr. Ruto:** On a point of order, Mr. Speaker, Sir. Further to your ruling, I wish to seek further clarification on the procedure that will be used where amendments are similar and probably not exactly the same. What would be the procedure in sequencing them or would others be dropped? Maybe, those presenting such amendments ought to merge them. What is your ruling?

**Mr. Speaker:** Hon. Members, that is a genuine concern and my direction is as follows and, indeed, as captured in the Communication that I made earlier with respect to the procedure that we will follow. The reason that we have advised that all amendments be first taken to our Legal Department is to ensure that the proposed amendments are in harmony with the rest of the Constitution and expert input is accorded to all proposed amendments, inclusive of consolidating amendments and ensuring that the amendments as proposed are rational. Where there is duplication, those amendments will appear as one and whoever has the largest stake, according to the good judgment of my Legal Department, will be the sponsor of the amendment. I hope that is clear!

Next Order!

*(Applause)*

## MOTION

### APPROVAL OF DRAFT CONSTITUTION
### OF REPUBLIC OF KENYA

THAT, pursuant to the provisions of Section 33(4) of the Constitution of Kenya Review Act, 2008, this House approves the Draft Constitution submitted by the Committee of Experts and laid on the Table of this House on Tuesday 2nd March, 2010.

*(By Mr. Abdikadir on 23.3. 2010)*

*(Resumption of Debate interrupted on 24.3.2010)*

*(Mr. Orengo moved to the Dispatch Box)*

**Mr. Speaker:** Order! I understand that Mr. Shakeel had the Floor and he still had a balance of 15 minutes. Do you wish to utilize those 15 minutes?

**Mr. Shakeel:** Yes, Mr. Speaker, Sir.

**Mr. Speaker:** Mr. Orengo, you caught my eye, so you will obviously have priority after Mr. Shakeel.

**Mr. Orengo:** I am much obliged!

*(Mr. Orengo bowed to the Chair twice)*

*(Laughter)*

**Mr. Shakeel:** Thank you, Mr. Speaker, Sir. To continue from yesterday, my contribution was in respect of the Draft Constitution. The Draft Constitution, as has been presented, is for the people. It has taken a long hard struggle to come to where we are. It is the sovereignty of the people that is at stake. It is the right of the people that the Constitution draft be approved. It is there to improve the citizens' quality of life.

*[Mr. Speaker left the Chair]*

*[Mr. Deputy Speaker took the Chair]*

Mr. Deputy Speaker, Sir, people have said that we want to improve the draft because it is not perfect. Yes, it is not perfect, but it is a start. The only perfect Constitution that I know of is the Holy Bible and the Holy Quran. They did not require any mutilation or alteration. The Constitution of this country is a contract between the people and the country. It started long time ago. The Ufungamano and Bomas drafts were people driven drafts. The people were helped by the civil society. However, due to various lacerations, what was a genuinely good draft was mutilated and we came up with

another draft which was totally unacceptable. As a result, the people said no resoundingly at the Referendum.

It is my concern that if we go ahead and allow the unnecessary mutilation of this draft, the people will say no. The Committee of Experts (CoE) consists of qualified and experienced people. They have won the hearts and minds of Kenyans. The Parliamentary Select Committee (PSC) also consists of very qualified people. We are proud of them. They have been able to put together and clarify certain issues that the CoE draft had. What is being presented to us is the best that we have. It will be a tragedy if we try and mutilate it now. We should not try to make it suit our own personal benefits. There are very many alterations that are coming up. History will hold us responsible. We must not allow grandstanding and political machinations.

Mr. Deputy Speaker Sir, we must not allow political movements to start and hijack the draft. We have taken a long time to come here and we must not allow---

*(Loud consultations)*

Mr. Deputy Speaker, Sir, it is a little bit difficult to concentrate because hon. Members are consulting rather loudly.

**Mr. Deputy Speaker:** Order, hon. Members!  Order, Mr. Mwatela! Mr. Shakeel will be heard in silence. If you have to consult, do so in as close to silence as possible.

Proceed, Mr. Shakeel!

**Mr. Shakeel:** Mr. Deputy Speaker, Sir, this draft has been recommended by the Law Society of Kenya, the International Commission on Jurists and many others who have seen what has happened. It is the best we have and it is what the people want.

I have been listening to many Kenyans as you all do when you go back to your constituencies and the Wanjikus, Onyangos and Mutuas all want a new Constitution. They tell me: Could you give us our Constitution, please? It is as necessary to us to do this quickly. If you do not listen; you will not hear. If you do not hear the wananchi, you will hear them at the referendum. So, my best recommendation is that we pass this Draft Constitution as it is. It can be altered at a later stage. It is a good alternative. It is not the best, but it can be improved.

On the issue of counties, what I would suggest here is that counties are best as they are set down and they will perform. We cannot afford to go along with 4,000 or 5,000 people in the various houses.

Mr. Deputy Speaker, Sir, with respect to abortion, I know that concern has been raised by the churches, Muslims and other groups. I understand there is what is called supremacy of law. The Constitution is supreme in this country but the law of God is supreme over any constitution. I would like Rev. Musyimi and others who have been arguing about abortion to hear what I am saying. Abortion is as old as time itself. So, trying to bring this issue into a constitution makes little sense at this moment in time. We, as Christians, Muslims or any faith, accept the supremacy of the law of God over the constitution. If you ask me to choose between the two, I will always chose the law of God over the law of the Constitution. I think that we must all bear that in mind when we are talking about abortion and other issues because the law of God is there and it states very clearly what the situation is.

Mr. Deputy Speaker, Sir, we must not think about what we can get out of this constitution, whether some of us will become senators or governors. Mr. I. Ruto suggested yesterday that this House of hon. Members will not want to become councillors. I would not mind becoming even a councillor as long as this constitution is passed.

Mr. Deputy Speaker, Sir, Kenyans are informed---

**The Assistant Minister for Co-operative Development and Marketing** (Mrs. Kilimo): On a point of order, Mr. Deputy Speaker, Sir. Is the hon. Member in order to be reading a speech? I thought we are supposed to be debating in this House.

**Mr. Deputy Speaker:** Proceed!

**Mr. Shakeel:** Mr. Deputy Speaker, Sir, I was not reading. I was consulting my notes!

Kenyans are an informed group of people. They are not uninformed as was the case earlier. We have suffered through the previous regimes where Kenyans have been oppressed. Luckily, Kenyans now have a right and they do speak. Like the photographs that have just come up,  I would like to bring to your attention that there are certain FM radio stations which are broadcasting hate and incomplete information in respect of this Draft Constitution. We would like these radio stations to remember that they have a responsibility as it is.

There have been complaints by the mayors and councillors that they are not part of the Draft Constitution and they will be excluded from it. I want to record my profound regret and concern about the mayors and councillors who came and demonstrated outside Parliament. The Rt. Hon. Prime Minister sitting opposite us, his position will no longer be there in the new constitution. We do not expect a person of that dignity to start complaining. I think that the mayors and the councillors who are leaders in this country have not behaved properly and have given the people the wrong impression in respect of counties.

With that, I support that the Draft Constitution as presented be accepted without any alterations whatsoever.

**The Minister for Lands** (Mr. Orengo): Thank you, Mr. Deputy Speaker, Sir, for giving me this opportunity to contribute to this very important Motion. What we are doing today has got historical consequences and impact. We may never feel the impact of what we are engaging in at the moment.

One of the most gratifying things about discussing this Motion at this time is that we are doing it in this Chamber where many of the battles were fought for the achievement of the Independence of this country. Many of them who stood here to speak for the people of Kenya are no longer with us. I think it behoves the importance of this Motion that by some strange coincidence of history, we are discussing this very important Motion in this House. You stand to be counted amongst the founders of this nation that when it mattered, you addressed this nation from this very august Chamber.

I am naturally a very happy man. If I was not part of this Parliament, I would have felt very disappointed. In the previous Parliaments, especially the first Parliament I came to, even standing up to speak in itself, you never knew how your day would end up. Many Members of Parliament were arrested from this very House for what they said in this Chamber and most of it had to do with constitution-making. I am glad that some

progress has been made and we can be able to say what we want in whichever way we want to say it without the fear of consequences.

Mr. Deputy Speaker, Sir, before we started debate on this Motion, the Speaker pointed out a very important matter in relation to the constitution-making process. I may be excused with respect to refer to one of the parts of the constitution that many of us would not referring to because we are more concerned with the body of the constitution rather than the preamble.

In the preamble, I found these words which are very important. In fact there are two parts of the preamble that I consider very important in this constitution-making process.
The first preamble says:-

"Honouring those who heroically struggled to bring freedom and justice to our land.   Exercising our sovereign and inalienable right to determine the form of governance of our country and having participated fully in the making of this Constitution."

So, if I begin with the last part of this preamble; it states in very clear terms that at the end of this process, the product that will go for publication as the Constitution of Kenya and become part of the basic law and the supreme law of the land, will be a document which has been made by the people of Kenya. This is quite different from the current Constitution, which was not a product, of neither this House nor the people of Kenya.

The second part is: "Honouring heroically those who brought freedom to our land".

Remembrance is a very important thing. Every country that forgets her history or even her heroes, is doomed to failure. There is a tradition that is emerging in Kenya that we tend to forget the people who stood against oppression in very oppressive times. Even if they are living heroes, we tend to forget them, except when it suits us to remember them once in a while. The preamble of the Declaration of the Rights of Man document which made the French Assembly in 1789, had the following words:-

"The representatives of the French people constituted as a National Assembly believe that ignorance, forgetfulness or contempt of the rights of man are the only causes of public misfortunes and of the corruption of governments."

Mr. Deputy Speaker, Sir, I want to concentrate on just two parts of that great citation from the Declaration of the Rights of Man which have been quoted over and over again. The first one is forgetfulness. How many times do we remember our people who fought hard? Some of them were detained. Some of them died in this struggle. How many times do we remember that after Independence, the process of unmaking the constitutional order was begun, not by a colonial power, but by our very own people who forgot the very reasons why our people fought to attain Independence? How many times do we forget that it was at the time when detention without trial became the order of the day that the culture of impunity started in this nation? Indeed, it is what brought about the corruption of our Government.

So, as we make this basic law, let us not be like the English soldiers who said two centuries ago, that laws are for the guidance of the rich and mighty and for the obedience and oppression of the poor and weak. I say this because if you look at this Constitution, it makes it very clear that those who govern this country must take the oath of office. They

must take the oath of office or rather the oath of solemn affirmation and an oath of allegiance. These oaths are set out on pages 185, 186 and 187. The President of the Republic, the Deputy President and the Cabinet Secretaries and the Members of Parliament are required to subscribe to these oaths before assuming office. In this affirmation oath, they swear to defend the Constitution and to govern in accordance with the spirit and letter of the Constitution. Many times, it is those who have taken the oath to defend and protect the Constitution who go against the very Constitution to corrupt the governing of the country. So, constitutions must bide rulers if they are documents which will last and bring about good governance.

Mr. Deputy Speaker, Sir, in making this Constitution, we must understand what is the problem that we want to deal with. Why is it necessary for us to have a new Constitution? There is a time when in the struggle in the streets, people were fond of shouting and saying: "Moi must go!" That was the clarion call. But we have realized that even as Moi went, this country is still nearly in the same situation that it was.

**Hon. Member:** Worse!

**The Minister for Lands** (Mr. Orengo): Somebody is saying worse. I can see it is my chairman and I cannot contradict him.

Even with those shouts that filled the nation all over that "Moi must go," we are still in nearly the same situation as we were in 1963 onwards. Hon. Ngilu is also reminding me that there was a prejudiced Christian song where we used to sing: "*Yote yanawezekana bila Moi!*" We thought that individuals by themselves can make a change and that our country can become a better place. In designing a Constitution, we must know the problem that we want to resolve. It is only by knowing the problem that we can design the Constitution that will stand the test of time. It is only by knowing the conflicts within us and how to address them that we can design a Constitution that will last for many years. In this history, there is a time when we were almost attracted to leave alone the pursuit of change through peaceful means and even imagine that we could pursue change through arms struggle. As Malcolm asked: "Is it the ballot or the bullet?" In the Kenyan tradition, other than the struggles that took place before 1963, we had decided that we will resolve conflicts, including the constitutional ones, through the ballot and that will be signified by the referendum that the people will take part in, in order to enact this new Constitution.

Mr. Deputy Speaker, Sir, we made a great achievement. This document, in other countries comes by way of revolution; by way of people shedding blood. We like citing the American  Constitution, which came through struggle and a revolution. Even the French Revolution or in recent history, in South Africa, their Constitution was achieved through struggle and violence. But we are lucky here in Kenya that we are reaching this great moment, choosing the ballot rather than the bullet. And by coincidence of history, the Lancaster arrangement in 1962 and 1963 were made possible when there was a Coalition Government. I do not know whether some of you remember that. That the last phase of those discussions in Lancaster took place when both Jomo Kenyatta and Ronald Ngala were Chief Ministers in the same Government. So, it was a Grand Coalition Government like the one that we have today. So, to the extent that the Accord has made it possible for us to come together to reach this historical settlement, it is also a great achievement.

So, I want to say that this document in its entirety – I am not saying that it is perfect – but it is better than anything that we have had before, and I commend it to this Parliament and the nation. But in saying that, without leadership, however good the document is, we need men and women who will be guided by the values contained in this document. If we do not live by the values and principles contained in this Constitution, all that is contained in this Constitution will be of no significance. This is because the unmaking of Kenya began by disregard and non-compliance of the law. We ended up in a dictatorship that we had to fight for so many years.

Mr. Deputy Speaker, Sir, I have noticed that other than what my learned friend, hon. Kajwang, referred to in his contribution, about the sovereign power of the people, you will notice in the chapter dealing with the Executive, that unlike the present Constitution, the Executive authority of the President and Cabinet Secretary is derived from the people, which is quite unlike the current situation. If I can compare it with what was happening about ten to 15 years ago because the law has not changed significantly, there was a time that we were told that even to imagine or encompass the death of a President was treason. I know that many Members of Parliament who are my colleagues here were taken away and detained on the basis that they encompassed and imagined the death of the "sovereign". So, we have gone through great times and this is, therefore, a historical moment.

Mr. Deputy Speaker, Sir, I want to end this contribution by saying that the most important chapter in this Constitution is about devolution. Without devolution, I can tell you, we are back to square one, because this is a presidential system. I want to be corrected in another 20 or 30 years that if we do not have devolution, the Presidency we have created is even more powerful than the current President. This is because the current President sits in the Cabinet with elected Members of Parliament. He derives membership of his Cabinet from this Parliament. He sits in Cabinet with people who relate to the people directly. This is a President who is not a Member of the Legislature. So, the only way that we can check this Presidency is through devolution. Any system – even monarchical systems – where there is a diffusion and de-concentration of power, be it in Old Germany or the Anglo Saxons, where there was devolution, you could see that not only the promises of liberty but also development could be achieved. I assure you that what we are even trying to do through the Constituencies Development Fund (CDF) by devolving funds is not re-inventing the wheel. There was mechanism and systems for taking funds to the districts in various programmes but there was no legal and lawful framework for accountability and representation at the lowest level. So, the CDF has made a little bit more progress than the District Commissioners (DCs) who were managing large funds but had no accountability or there was no system for interrogating them.

Mr. Deputy Speaker, Sir, if we are creating regions or counties on the basis of ethnicity, you have missed the point about devolution. If we want to live in ethnic cocoons, devolution will not resolve our problems. Even a Member of Parliament said yesterday that Kenya is still a tribal country even as we say that we are a unitary State. Devolution is giving the promises of better governance because you are taking the administration, accountability and resources to the people. If you look at Nairobi today, the Maasai or Kikuyus can claim Nairobi today, but times have changed. Nairobi now is a metropolitan City. In another ten years, Mandera also will be a metropolitan city. So,

the way to look at devolution is about governance. If at all we take this Constitution without looking at the elements of devolution properly, then I am afraid we have missed the boat. We should be very courageous and brave because in 1963, resources were going to the regions. It was not by changing the Constitution that the regions went but by starving the regions of funds and even the power to tax the regions. That is how the regions were killed. But when the regions were working, even hon. Ngala was feeling better and safer as the president of the Coast region rather than being a Member of Parliament here.

The other thing that we are addressing through devolution is exclusion. What has made us suffer as a nation is exclusion. Once people feel excluded, even when you want to employ a policeman or constable or you want to build a dispensary, it must come from the centre.  In the colonial days, these things were being done on the ground and they could give bursaries and build roads. I commend devolution. Those who fear devolution are living in the past. They are being guided by their ethnic consideration and objectives. They are living in the past. If America was living in a situation where they feared ethnicity and did not see itself as a multiparty state or nation, how could a young man born here in Kenya, who is not even a native American, become the President of America? It is because they did away with exclusion. What has killed us here is exclusion; that once Mr. Orengo is President, I know of no other place than Ugenya. That is why we were fighting against these many Presidencies in the past. I hope that Kenya will come of age. This country must come of age. People want freedom and nations want liberation, but countries want independence.

I beg to support.

**Prof. Kamar:** Thank you, Mr. Deputy Speaker, Sir, for giving me the opportunity to contribute to this historic Motion. I would like to support it with amendments and I will be mentioning which ones.

Mr. Deputy Speaker, Sir, allow me, first, to congratulate those who have participated in the process of Constitution-making in this country. I want to recognize the veterans – the Orengos and Imanyaras – past and present. I also want to remember to recognize the Bomas group of delegates that gave us the first Draft (2004). I also want to remember the Committee of Experts (CoE) and our own Parliamentary Select Committee. These people have done a commendable job. The Constitution making process has been very long and tedious. Sometimes it has been acrimonious and tempers have gone up and down. But all in all, the process has brought us this far and we must thank God for that.

Mr. Deputy Speaker, Sir, it is instructive to note that while it has taken a very long time, there are some areas that have consistently remained in all the drafts that we have today. As we consider that, we are reminded of why Kenyans wanted to have a Constitution, to begin with. In the preamble, there is a statement that says: "We, the people of Kenya adopt, enact and give to ourselves and our future generation this Constitution."

Mr. Deputy Speaker, Sir, we must ensure that Kenyans get a new Constitution that will serve them and the future generations.  How do we ensure this? We must ensure this by ensuring that the Proposed Constitution is good for all, fair to all and serves all. This may require the spirit of give and take, but it must all be inclusive and non exclusive. The eyes of the nation are focused on this House. We must rise to the occasion

to ensure that we do not create any further doubts that the Tenth Parliament has made good all along. We should be the Parliament that will do what His Excellency the President has said; to do ourselves proud and produce a Constitution this time round.

Mr. Deputy Speaker, Sir, to make this Constitution all inclusive and non exclusive, it is the duty of this House to take this phase of the Constitution-making very seriously. We must walk through all the Articles and Clauses carefully and diligently. If we must amend, we have to do our duty. We must amend those clauses that require amendment. If we avoid to do so, at this stage when all the other phases from Bomas have done their part, it will be failure on our part. Maybe this is not the stage where the leadership of the nation are used to rubber stamping. We must do our job because we are paid to do it. We must work.

Mr. Deputy Speaker, Sir, the current Constitution has served us for more than 40 years. It is my hope that the proposed Constitution will never be amended by anybody who will be alive by the time we enact it. So, it must serve us for a period of not less than 100 years.

Mr. Deputy Speaker, Sir, I have been listening very carefully since the beginning of the debate. I had some Members indicate some fears. They were discouraging the idea of changing anything, including comas. I asked myself: "If Members of Parliament, the leadership of the nation fear to change even a comma in this document, who will do it?" We must rise to the occasion and make sure that we do what is right. There is nothing called pandora's box in leadership. The sooner we open the cans of worms, the better, so that we can clear up because nobody else will do it. We must do it and do it in boldness. So, we cannot skip the phase that we are in by avoiding to do what is expected of us, unless, there is something somebody knows is hidden somewhere in the chapters, and fears that if we carefully go through them we might discover it and deal with it satisfactorily. It is our job to do so. We must thoroughly scrutinise the Proposed Constitution. I want to persuade all Members that the fear of the unknown should be out of the window when it comes to leadership and Parliament. We must agree to debate and two-thirds will win and the one-third will accept what the two-thirds have said. So, we must not be heard by this country saying we should not touch anything. We must touch it. This document is here for a purpose and we must do so.

Mr. Deputy Speaker, Sir, the Naivasha retreat was attended by a handful of us. We had hoped to have a session where the Members of the Parliamentary Select Committee on the Constitution would have spoken to us. That did not materialise. Our meeting at the Kenya Institute of Administration (KIA) failed to scrutinise this document. Therefore, we need to scrutinise this document properly. Avoidance is not a solution. If we avoid doing what we must do, I am afraid the Tenth Parliament should never pretend to have delivered the Constitution. Instead we must give credit where it belongs and give it to the veterans; Bomas team and the Committee of Experts (CoE). If we skip this process we do not deserve to say we actually did it because we will have only rubber-stamped this document without our input.

Mr. Deputy Speaker, Sir, it is worth noting that this draft has continued also to change progressively. That is from the Bomas Draft of 2004 to the Harmonised Draft published in 2009, Revised Harmonised Draft that followed, of course, the current Proposed Draft before this House. So, we have every reason to agree to look at the document. If there is anything that those of us who were not in Naivasha feel was

mutilated or feel must be borrowed from the current Constitution, we should be able to address it, so that we give Kenyans a Constitution that will serve them for a century.

Mr. Deputy Speaker, Sir, there are also real issues that we need to look at. That is why I support that the document must be opened. I will highlight a few examples. There is the Supremacy of the Constitution Article 2, Clause 5. It says:

"The general rules of international law shall form part of the law of Kenya."

That is very scaring because we have given a blanket cheque to international law reformers. We want to open our country to any law that comes from the international community. We need to open up this document, so that we deal with issues like that. We must ratify any international law in this House. Any glaring error like that must be dealt with.

Clause 11(2)(c) has done promotion of intellectual property rights very well. But when you go down to the legislation by this House, this document denies the House the opportunity to legislate on indigenous knowledge. The whole essence of the intellectual property rights lies in the protection of the knowledge. Our indigenous people have a lot of knowledge that must be protected. Today, we enjoy Chinese tea and herbs. However, we do not want to legislate and protect our tea and herbs. There are a lot of trees with medicinal value that require protection. But beyond that, we must also protect the knowledge of our people. That means, we must open that document.

Mr. Deputy Speaker, Sir, there is the limitation of rights and fundamental freedom, Clause 24, the favourable of hon. Nkaisserry. It is on the freedom of association, assembly, demonstrations and labour relations for the Kenya defence forces and national police forces. We raised this because we did not know who the  defence forces were and or national police forces. We are informed that it does not cover the prison and Kenya Wildlife Service warders. If we do not correct this document, it will mean that the prison warders can also have their own union. They can go on strike. We can all imagine how the prisoners will behave without prison warders. So, this document must be opened up, so that we pay attention to some of those issues.

Mr. Deputy Speaker, Sir, there is the issue of the right to life, Clause 26. Who are we listening to? The whole country has been saying it must change. If we say we do not want to change even a comma in this document in this House, what is the leadership doing to the country? We must open up this document and deal with that chapter. Yesterday, a number of us from this House were in a function with doctors and the church. Some of the doctors were very clear that their own hypocritical oath, when they graduate from university denies them the opportunity to do abortion. According to them, if we are going to have this in the Constitution, then the minority will overrun the majority. They are very clear that those who are abortionists within the medical sector are very few. Most of them would like to honour their own hypocritical oath and they do not want their Constitution to be party to that. We must change that. For that reason, we must open up this document and do the necessary correction.

Mr. Deputy Speaker, Sir, when we were at the Kenya Institute of Administration, before we stopped abruptly, we came up with over 70 clauses that needed corrections. We even informed the Committee to look at those clauses and amend them appropriately. There were many of them. Representation had problems. We had a number of problems.

So, we cannot shy away from that. I want to persuade my colleagues that we must rise up to the occasion and actually ensure that we do what we must do in this House.

Mr. Deputy Speaker, Sir, I want to touch on the area of devolution that was sensationalized yesterday. Devolution and, in particular, regional governments have been part of the three tier devolution since the Bomas days. In Bomas, 14 regions were agreed upon after six months of debate. In the Harmonized Draft, they were reduced to nine. They are not creations, as was said yesterday, of any individual ethnic group or region to suppress others. We must be very honest because whatever we say in this House goes down to the grassroots and we distort information. Some hon. Members mentioned that there were fears that if we go for regions, the problems of 2008 may return. I asked myself: Have we forgotten why we got into those problems in 2008? Did we have regions in 2008? I think we should be very clear so that we do not destabilize the people even before we take care of all our Internally Displaced Persons (IDPs). Currently, we have IDPs who have been forgotten in Uganda. They never left from Rift Valley Province! The focus yesterday was that Rift Valley might do it again. I said: But the ones who are yet to be brought back from Uganda never walked away from Rift Valley! We must deal with issues that are on the ground. We should deal with the issues of 2008 boldly and sort them out. That is because if there will be suspicion of counting of votes in 2012, it does not matter whether we have counties, regions or whatever else! It is very important that we be very honest and deal with issues.

Mr. Deputy Speaker, Sir, we need to interrogate this document in an honest way. I want to say that I support devolution, like the hon. Member who has spoken before me. It will be cowardly for us not to devolve and, yet, one of the key issues that we told the country when we were coming up with the Constitution was that we want real power and resource devolution. In the current situation in the proposal that we have, we have gone from the national stage to the counties. If you look at the duties that have been given to the counties and the duties that were given by the Harmonized Draft that had a regional government, they are exactly the same. So, where did the roles and duties of the regional governments go? Whatever we call it, for me, "regional" does not have to be used; "Majimbo:" does not have to be used; but you need somebody to co-ordinate the units that are below. Otherwise, if we are going to have direct supervision from the national Government, then we are, again, back to the same old story because it will be the same county councils direct to the national Government! It is going to be worse now because we have moved the House of Representatives, which is this House, away from the resources that are going to the counties and given the powers to the Senate. Without forums for the Senators and the policy makers to actually co-ordinate and guide the development of a region--- Call it a region; call it a province--- Maybe, when you call it a province, it is better. If you do not have a unit to co-ordinate, it will be very careless of us to actually agree that you can have a school that is run by the headteacher and the students without the prefects and the teachers in the middle. It is going to be very, very sad!

Mr. Deputy Speaker, Sir, it is very important that we actually look at things in a very sober manner. If there is a problem; and I even want to touch it in the context of abortion--- If there is a problem that requires abortion and we are being told that we need to deal with it because of rape, let us deal with rape itself! Let us arrest the rapist! Let us kill the rapist instead of killing the innocent product of such a situation! If we do not start

dealing with the issues and we want to go around them, we are not going to finish dealing with all our issues.

So, Mr. Deputy Speaker, Sir, I do support this Proposed Constitution, but amendments must be done. We have a lot of issues that need to be dealt with; we have a lot of work that needs to be done – whatever we call the devolved system between the national and the county, I have no problem. But it must serve the purpose that the Harmonized Draft gave us; which was, if I may quote: "To co-ordinate the implementation within the counties forming the region; to co-ordinate the programmes, the projects and to supervise the same across counties". That is because nobody else will do it. If we leave it to chance, who is going to do it?

Mr. Deputy Speaker, Sir, I want to thank you as I wind up. I want to persuade hon. Members that we need to deal with these issues now. I beg to support.

**Mr. Njuguna:** Mr. Deputy Speaker, Sir, I thank you very much for seeing my height at the back of this honorable House. I tried to catch your eye 39 times since yesterday but, nevertheless, I have been given the opportunity.

First, Mr. Deputy Speaker, Sir, I wish to thank the Parliamentary Select Committee and the Committee of Experts for the good job that they have done for this House and for the entire nation. It is important to recognize the efforts that they have made during the whole process to make sure that the entire nation is kept at pace on what is happening. Their commitment is also noted and it is very important for us all. Their energy and time already spent in the whole process should not go into any waste.

Mr. Deputy Speaker, Sir, I wish to recall the Constitution of 1963; known as the Lancaster Constitution and some of the participants who took part in that very important undertaking. We recognize the role that was played by the late Ronald Ngala, Martin Shikuku, Mbiyu Koinange and others. They really helped the foundation of this nation through that constitutional process. It is important that, that Constitution that has served this nation for the last 47 years be reviewed because at that time, the population of this nation was less than 10 million people. Today, we are talking about 40 million Kenyans, their demands in terms of social and economic development and even the security of this nation need to be kept well.

Mr. Deputy Speaker, Sir, the Constitution that we need in this nation should be able to address some of the concerns that have really affected our people; the kinds of experience that we noted in 2007 should be addressed by this new Draft Constitution; the kind of destruction that we noted; the killings that we noted; even the evictions that created a new community in this nation called Internally Displaced Persons (IDPs) community should be addressed. Those are events that should not be imagined in this nation. The draft Constitution that we intend to approve should guarantee the security, peace and stability in this nation.

Mr. Deputy Speaker, Sir, we will not forget those people who laboured to make sure that we get a new Constitution. Some people were tortured at Nyayo House. Some lost their lives and others were disabled. In the media sector, we remember Mr. Gichere and others. These are the garland sons of this nation and they should be remembered for their struggle to liberate this nation.

I have noted that there is a clause on the recall of Members of Parliament in the proposed Constitution. This is a new development and is historic in our nation because this is the first time we are getting a clause which will challenge the diligence and

delivery of service by Members of Parliament. The constituents will now have an opportunity to look at the services and duties executed by individual Members of Parliament in the constituency. It is a wakeup call to all of us to start delivering that service to our constituents. I support that clause because if we really want to serve the people for five years, then we must come out with a serious degree of commitment and execution of duties. We must deliver those basic requirements in our respective constituencies. We should also serve our people with a lot of humility.

Mr. Deputy Speaker, Sir, when I looked at the clause on the Executive, I noted that there is a very clear provision that a serving President will not be allowed to serve for more than ten years. It is in our minds that the founding father of this nation, the late Mzee Jomo Kenyatta served for 15 years. The second President of this nation served for 24 years. In my mind, continued stay in that high office may inconvenience and cause instability in the nation. Therefore the new clause that talks of a maximum of ten years is really good. It will be a challenge to the holder of that office. It is, therefore, clear now that no President in this nation will ever serve for 20 years or 40 years. That is only limited to 15 years. It is also noted that the bloated Cabinet that has "eaten" a lot of resources almost draining the Treasury will be reduced to a level of 20 Ministers or 22 Ministers. This is per the desire of this nation. I fully support that provision in the Constitution.

I also note that the Secretary to the Cabinet will also be appointed and approved by this House. So, the Executive will have no role of appointing a brother, a sister or somebody from that community. It will be exposed to the entire nation. The person appointed to that office should be competent and qualified to hold that office. It is indicated that the Cabinet Secretary should be appointed through the approval of the National Assembly. I recommend that gender consideration in the appointment to that office is very important. We could even start with a lady in that office so that we see how they will serve this country. That should start with the new Constitution. If I had a daughter, I would have asked her to compete with the other ladies in the nation for that position.

Mr. Deputy Speaker, Sir, I have also noted that Ministers will come from the private sector. We have seen sons and daughters from the private sector excelling in performance. We cannot fail to recognise the role that has been played by Mr. Titus Naikuni at the Kenya Airways (KQ) and Mr. George Oduor at the Kenya Commercial Bank (KCB). We expect to have the best performance in this country. The KCB was almost going under but Mr. George Oduor has revived it.

I have also noted something about the swearing in of the President. It will never be done in the middle of the night but will be conducted during the day. Our children in primary schools and those in the kindergatten and other people will see the President being sworn in publicly during the day. That is historic and a very good development.

Judicial reforms are very important. We have seen cases accumulate to almost a million and innocent people have been affected. There are people in this country who have waited for 20 years to have their cases heard. The system has been very hostile and unfair. It should be reformed immediately.

We have seen the entire population lose confidence in the judicial system. Vetting of judges is very important. The whole system will be accountable because those who will be appointed to these offices will be vetted properly. Academic qualifications will be

considered. People should not be appointed to offices under tribal, ethnic or nepotism considerations. We want all the sons of this nation to be given a fair chance in the recruitment exercise.

On *Mashujaa* Day which was previously called "Kenyatta Day", it should continue to be known as "Kenyatta Day". This is because this is the day we recognise the people who participated in the whole process. It is like we have now forgotten the founding father of this nation. If this House and some people in this country forget the noble role that was played by the founding father of this country--- We recall how our neighbouring countries namely Tanzania and Uganda assisted each other. The late Julius Nyerere, the Milton Obote and Kaunda of Zambia intervened to see that the East African region was liberated.

Although we will have the *Mashujaa* Day there are heroes in this country who are not placed anywhere. If you look at a boxer like John Olulu who fought gallantly for this nation in the Commonwealth and Olympic games, you will find that he has been forgotten together with his family. There are others like Philip Warigi and Wangila Napunyi who died a poor man. It is important that the real M*ashujaa* are recognised. Mr. Robert Ouko and an athlete like Sarafina Ntao and others who ran in the 1960s need to be associated with the *Mashujaa* Day. Sarafina Ntao ran 200 metres and beat other athletes from the international community. Mr. Munyao raised the national flag on Mt. Kenya at a height of 17,000 feet. We only remembered him when a harambee was conducted after his death. They should be remembered when they are still alive. My pressure may rise sometimes when I talk. It is important that we remember the late Paul Ngei.

With regard to the minority communities, the Dorobo, the Ogiek, the Kurias and others should be remembered. They should be given key appointments in the Government. Let them also enjoy the fat salaries. They must also be given the best facilities so that they can construct better schools and centres. Their region should be supplied with electricity and not taking generators there. They should be considered as very important people in this nation.

I also noted something serious. The Mau Mau have been forgotten and yet they are the ones who liberated this country. Those heroes are still walking. Amongst the street families, we have innocent women. They are never recognised in this nation. The national Budget should accommodate these families.

Mr. Deputy Speaker, Sir, on police reforms, it is very disheartening that innocent people, professionals and academicians are being kidnapped daily in Nairobi. Parents get concerned when their children leave for school, because they do not know whether they will go back home. Extra-judicial killings in this country must also be stopped.

It is good that the Teachers Service Commission (TSC) has been given autonomy but we are concerned that the whole nation has continued to experience serious under-staffing of teachers. This is an issue that needs to be addressed quickly, so that the quality of education in our schools can be maintained. Even the issue of promotion of teachers must be addressed properly.

Mr. Deputy Speaker, Sir, with regard to national security service, we have seen flares and disorder in areas bordering Sudan, Ethiopia and other areas. The National Security Intelligence Service (NSIS) must be reformed, so that it can measure up to the current threats that are confronting our nation. The threat of piracy in the Indian Ocean can also be gauged and controlled properly.

On the issue of counties, I would like to support the 47 counties that are already reflected in the Draft Constitution. These will serve us well. Where there is need to cater for the interests of the minority, a provision must also be made, because they are also important in this nation.

I, therefore, wish to fully support the document.

**The Assistant Minister for Livestock Development** (Mr. Duale): Mr. Deputy Speaker, Sir, on the outset, I want to thank the PSC on Constitutional Review, the CoE and all those who got involved, including this House, for their efforts towards giving this country a new Constitution.

Kenya has a very interesting constitutional history. If I may go back to the time of Independence, at the Lancaster House in 1963, the people of northern Kenya who I represent, were not represented in that constitution-making process. This is to say that 47 years down the line, the people of northern Kenya now have a golden opportunity, through their leadership, the people and all the stakeholders, to make their case heard.

Since 1963, the Constitution of this country has been amended several times, but the most far-reaching of all those amendments was the one that dismantled multiparty democracy and ushered in a one party State. The second one was the reversal of the Act that repealed Section 2A.

Mr. Deputy Speaker, Sir, the biggest gain by the people of northern Kenya in the history of this is the new Constitution that we are making. Why do I say so? Under the current Constitution, the people of northern Kenya suffered immensely through violation of many of their human rights. Security forces committed mass murders, judicial killings and arbitrary arrests.

To say it more clearly, in November 1980, the State massacred 3,000 people of northern Kenya at a place called Bulla Kartasi in Garissa. This country is aware of the Wagalla Massacre of February, 1984, when the security forces mounted an operation in Wajir, targeting the Degodia sub-clan of the Somali community. During that incident, a lot of killing and rape was done at Wagalla Airstrip. Five thousand people were killed during that operation. More and more such incidents happened. Talk of the Malka Mari and Takaba massacres.

These cases are an indication that the fundamental human rights of the people of northern Kenya were violated through various laws, specifically targeting the people of northern Kenyan and more so, members of the Somali community under the current Constitution. So, those people of northern Kenya who passed away and those of us who are alive know that the current Constitution has discriminated against their people. They were discriminated against through laws, regulations, practices and procedures that apply only to the Somali people of northern Kenya and their neighbours; the Borana and the Gabra.

Mr. Deputy Speaker, Sir, when it comes to issuance of birth certificates, identity cards and Passports, the people of northern Kenya, under the current Constitution, were discriminated against. This culminated in the infamous Somali Screening Card of November, 1989. The introduction of this card, which targeted people of Somali origin during that time, was justified by the then Government in one statement.

I want you to give me permission to read that statement, which says:-

"The Government is to register all Kenyan Somalis and expel those found to have sympathy to the Government of Somalia."

I call this mass verification exercise and violation of the fundamental rights to protection from discrimination as enshrined in Section 82 of the current Constitution. That brings me to the point; that the Bill of Rights, as contained in this Draft Constitution, gives all the hope and security to the people I represent and to the people referred to as "people of northern Kenya".

Mr. Deputy Speaker, Sir, I want to dwell more on the reasons as to why the people of northern Kenya must see a lot of hope in this Draft Constitution. For the last 45 years, the people of northern Kenya suffered from marginalisation and under-development. The legacy of the previous Government is that of under-development in all aspects of life in the region that I represent. The main concern of the Government of the day then, was that of security.

I want to come to the particular issue of constitutional reforms that this country went through since 1997 that had a bearing on the people of northern Kenya. That is why they must support this document. During the clamour for reforms in the 1990s, Section 2A of the Constitution was repealed. The people of this nation also know that on that same day, Section 127 of the Constitution, on the emergency law, which was in place for so many years and which repressed the people of northern Kenya was replaced.

Mr. Deputy Speaker, Sir, to date, in the current Constitution, we have the North Eastern Province and Contentious Districts Regulation of 1966. We still have the Indemnity Act that segregates the people of northern Kenya by ensuring that they do not pursue the issue of the atrocities that were committed against them between 1963 and 1967. That is why I stand here and support this Draft Constitution and more so, the Bill of Rights. To me, the Bill of Rights is one of the best chapters of this Draft Constitution. I call it "the people's chapter".

No community or region in this country should feel inferior. No members of a community in this country should feel that they are second class citizens. Every person and community in this country has a right to live and enjoy all the fundamental principles.

Mr. Deputy Speaker, Sir, I want to quote president Roosevelt of the United States of America (USA) who once said, "No one can make you feel inferior except with your own consent".

It is the people of Kenya, through their consent that they should feel inferior or superior. It should not be in the Constitution. That is why I say to the people of northern Kenya that we are coming from a Constitution that neglected you; a Constitution that made you inferior and second class citizens. It is historical moment for the people of northern Kenya and all Kenyans that we must pass this document that we feel has all the good things.

Mr. Deputy Speaker, Sir, I feel honoured to tell my people to support this document because under the current Constitution, the Stock Theft and Produce Act is still in force as far as the people of northern Kenya are concerned. This is an Act that provides collective punishment that the people of northern Kenya have suffered all along.

Having said all these, I want to come back to this document. A lot has been said about this document. The Vice-Chairman of the Parliamentary Select Committee on Constitutional Review said it on the Floor of the House on Tuesday---

**The Assistant Minister, Ministry of State for Provincial Administration and Internal Security** (Mr. Lesrima): On a point of order, Mr. Deputy Speaker, Sir. I do not

want to interrupt my friend, but, would I be in order to suggest that after this speaker you reduce the time for contribution from 20 minutes to ten minutes? Basically, the whole of Wednesday will be taken by amendments. This means that only Members who have put forward amendments will get an opportunity to contribute and yet many of us want to speak.

**Mr. Deputy Speaker:** Indeed, Mr. Lesrima, you are very right in that Standing Order No.87 on limitation of debate, indicates that:-

"The House may on a Motion made by any Member in accordance with this Standing Order, impose a limit in respect of debate on any particular Motion or Bill by allotting a limited period of time for such debate or by limiting the time during which Members may speak in such debate or by imposing both such limitations".

The Standing Order goes ahead and tells you that you did not need to make a notice to the Chair when rising on such Motion. However, it goes further and says"-

"Provided that such Motion shall not be made in the course of the debate to which it refers unless it is moved after adjournment of such debate and before the debate is resumed".

This means, you can move it on Tuesday morning before the debate on this same Motion resumes. You cannot do it on the same sitting and in the middle of the debate.

That is fair enough. That is the position of the Standing Orders!

Mr. Duale, continue!

**The Assistant Minister for Livestock Development** (Mr. Duale): Mr. Deputy Speaker, Sir, I was saying that the Vice-Chairman of the Parliamentary Select Committee on Constitutional Review said on the Floor of this House that this document is on transit train. What does that mean?

**Mr. Deputy Speaker:** Order, Mr. Duale! Nonetheless, in line with the direction that was given by the Chair, Members also have the liberty to limit themselves! That is entirely at your discretion for this sitting. In the event that you want to move the Motion you can do it on Tuesday morning before the debate on the Motion resumes. By the will of the House the matter will be carried.

Proceed, Mr. Duale!

**The Assistant Minister for Livestock Development** (Mr. Duale): Mr. Deputy Speaker, Sir, for those who want to use five minutes, ten minutes or 20 minutes it is the discretion of the individual Member of Parliament.

Mr. Deputy Speaker, Sir, I was saying that the Vice-Chairman of the Parliamentary Select Committee on Constitutional Review, Mr. Ababu Namwamba, said on the Floor of the House that this document is on a transit train. That means that the document ultimately belongs to the people of Kenya.

Mr. Deputy Speaker, Sir, Parliament is a very important organ of review. Parliament has the document not to mutilate but to improve it for the benefit of the people of Kenya.

Issues on devolution, land and abortion are very critical chapters of this document. On the Chapter on representation, Article 89(1) is very contentious as far as the people of northern Kenya and those who come from sparsely populate areas are concerned.

Article 89 gives express weight to densely populated areas. We must relook at this country as a country that belongs to all of us. My view is that chapters on devolution need

to be improved by Members. I want to use the word, "improve". The chapters on land, abortion and representation must also be looked into. As the Vice-Chairman said, I also want to say it here clearly that this House must pass this document and give the final verdict with the people of Kenya. This document belongs to the 39 million Kenyans who will, in their own discretion feel that if the people of northern Kenya have an issue and the issue of representation is not solved in this House, the people of northern Kenya will wait for this document at the referendum.

Those people who feel that abortion is a very critical issue, and I want to say it here, as a Member who professes the Muslim faith, I have a moral obligation and a religious obligation not to allow in the Constitution of this country any Article that will allow abortion. But that again rests with the people of Kenya.

Mr. Deputy Speaker, Sir, on the Chapter on devolution, a lot has been said. There are 47 counties in the document. There are many amendments that are sectarian, individual and regional. We cannot call ourselves the leadership of this country if we bring amendments to this document based on our political interest, party interests, regional interests or ethnic interests. My view and the way forward is for this document to be passed by this House. The people of Kenya from North Eastern to Nyanza, Coast to Western need to look at it and if they feel in their opinion this document serves them better, they will have a choice. This is the document of the people of Kenya. We, as Members of Parliament, are here to improve this document on the basis of the people of Kenya.

If we are going to have horse trading where we say, "remove the transitional clause and I will support you in the abortion clause, bring *Majimbo* and I will give you more counties", then I think we better be honest to each other. We better be honest to the people of Kenya. We are not honest. We should not play the politics of deceit!

Mr. Deputy Speaker, Sir, the 222 Members of this House must look at each other and see themselves as the representatives of the people of Kenya. You must not see yourself as coming from Central Kenya.

I saw an amendment and I was shocked. It was a sad day for me that a Member feels that Dujis which is 7,000 square kilometers cannot be a county but Westlands which is 70 square kilometers can be a county. It is very sad that Embakasi, Dagoretti and many others--- My position is very clear that the amendments brought to the House must not be national amendments.

Mr. Deputy Speaker, Sir, we must call a spade a spade. These are individual regional amendments. We are not proposing a document that when people ask for regionalism, the element of chasing other Kenyans from those regions comes into my mind. When we talk of regional governments, many Kenyans will remember what we went through in 2007. But if we practice politics of honesty, then we will tell the Kenyan people that this is the best document that the 27 Members of the PSC sat in Naivasha and came up with although, they could not agree. For five days we sat at the KIA and it was very shameful that the leadership of this country could not agree to a document so important and so significant to the people of Kenya.

With those many remarks, I beg to support.

**The Assistant Minister, Ministry of State for Defence** (Mr. Musila): Thank you, Mr. Speaker, Sir, for giving me this opportunity to make my contributions. I want to say that I support this Motion which is before the House. We have come a long way in

the constitutional process making and I submit to this House that we have a choice but not an option; that we must back this document. We must do so because it is the wish of Kenyans who we all represent, that we pass this Draft Constitution document.

*(Loud consultations)*

Mr. Deputy Speaker, Sir, I seek your protection!

**Mr. Deputy Speaker:** Order, hon. Members! Hon. Wakoli, the hon. Musila has to be heard in silence. Proceed, hon. Musila!

**The Assistant Minister, Ministry of State for Defence** (Mr. Musila): Thank you, Mr. Deputy Speaker, Sir. I am much obliged. I was saying that Kenyans who we all represent yearn for a new Constitution and I think we have a choice and not an option to give them what they require; a new Constitution. Kenyans have come a long way. Previous speakers have very eloquently described the various gallant Kenyans who have fought very hard for a new Constitution. Many politicians, many professionals even members of the civil society have worked very hard to bring us where we are today. I think we will be paying tribute to all gallant Kenyans; dead and living, who have worked very hard to ensure that we reach where we are. Therefore, I urge all Members to support this document.

Mr. Deputy Speaker, Sir, among the many reforms that are proposed in this new Constitution, is devolution. The hon. Minister for Lands, Mr. Orengo, who spoke a while ago, explained very eloquently the importance of a devolved Government. I want to say that I support the principle of devolved Government. In the devolved system of Government, many new things are going to happen. As the House will recall, for the 47 years that this nation has been independent, we have witnessed certain areas being left behind in development. This is because of lack of careful allocation of resources. Resources have been allocated in a skewed manner so that we have many areas in this Republic, that if you ever visited, you would be excused to think that you are not in Kenya. We want a devolved system of Government where resources will be equitably distributed for the development of our nation. Through this system of devolved government, there is the creation of the Commission on Revenue Allocation and also an Equalization Fund. Those funds will ensure that those areas that have been left behind hitherto will develop and, in about 20 years, we can see all areas of this country being developed equally.

Mr. Deputy Speaker, Sir, in the document that we are debating today, there is a chapter on the Bill of Rights. I think it is a milestone because, for the first time, the rights of citizens of this country have been clearly spelt. Therefore, I think the Bill of Rights will go a long way in improving governance in this country and also ensuring that the human rights of citizens of this country are protected. However, I would like to point out that in exercising those rights, we must not lose sight of national interests. I say that because within that document, the right to picket and go on strike of members of the disciplined forces has been guaranteed. We must learn from the mistakes of others. If you recall, only recently, members of disciplined forces in the Republic of South Africa picketed and went on strike. While I appreciate that the Parliamentary Select Committee (PSC) did everything possible to limit the rights of members of the armed forces to picket and go on strike, we still have a large section of our disciplined forces with those rights

still guaranteed in this Constitution for example, members of the disciplined forces like the Prison Service which has now been named Correctional Services and Kenya Wildlife Service (KWS). All those who handle arms have been given rights to picket and also go on strike. Therefore, I propose that we will be well advised to limit the rights of members of disciplined forces to picket and go on strike. I will be introducing an amendment in this regard and I will be seeking the House to support it.

The other area of representation--- I think for the first time in the history of this country, we were able to come up with a formula that will guarantee fair distribution or delimitation of electoral units. The introduction of a formula - like what Dr. Khalwale referred to as a population quota - will go a long way in ensuring that the boundaries commission will be guided by certain formula in delimitating electoral units. In the past, gerrymandering was the order of the day and nobody was able to explain why certain constituencies were made. Having said that, I have noted and I am persuaded that, in fact, much as we tried to improve on this, there may be a very good case to consider another way of assisting those areas which are sparsely inhabited. Therefore, I think there is a good case for allowing the boundaries commission further leeway beyond the 40 per cent, so that the less or sparsely populated areas can be considered. I think I have seen an amendment by Mr. Bahari to that effect and I think the House will be well advised to support it.  I think that we must consider all areas when we talk about resources and delimitation so that we are a nation.

Mr. Deputy Speaker, Sir, the other issue that I want to point out is the area of Provincial Administration. The service known as Provincial Administration has been retained in this Constitution as indeed was the popular request by members of the public to the Committee of Experts. The proposed Constitution requires that the Government or the Executive will reform the Provincial Administration to conform to devolved units. It is necessary that the Government, as a matter of priority, looks into the issue of Provincial Administration so that although it is retained in the draft it does not mean that it is perfect. I think a lot of retraining should be done to the Provincial Administration so that it conforms to the present day Kenya. Of paramount importance is the need for the Government to immediately bring to this House a Bill so that we may legalize all districts that were formed after 1992. As we speak, all districts that were formed after 1992 are illegal. It is only fair that the Minister responsible brings a Bill to this House so that we may proceed and legalize them.

Mr. Deputy Speaker, Sir, I would also like to appeal to hon. Members to close ranks so that when we go to the issue of making the proposed amendments, we sit down and dialogue so that we ensure that all those amendments that are proposed that are for the benefit of this nation and our people are given priority and the necessary care and consideration so that we do a very fair job to this document, which is clearly a historic document.

Mr. Deputy Speaker, Sir, the eyes of Kenyans have been pegged to our activities as a House in the process of making this Constitution. Many people have even blamed the House for delaying the process. I am confident that in a week's time, this House will finish its business and pass on the responsibility of constitution-making to Kenyans.

I want to appeal that we ensure that the process of the referendum that will follow eventually will not be acrimonious. Let us not replay the campaigns of 2005. As we go to the next process of referendum, I want to appeal to all of us to ensure that we unite our

people so that we go to that exercise a very united nation. This will ensure that at the end of the day when we finish the process, we will be a stronger and more united nation. We owe it to Kenyans, our children and to future generations to ensure that we pass the document that will stand the test of time so that those who come after us will praise us like we are praising others who have come before us.

Thank you.

**Mr. Deputy Speaker**: Yes, hon. Bifwoli!

**The Assistant Minister for Lands** (Mr. Bifwoli): Thank you, Mr. Deputy Speaker.

*(Loud consultations)*

**Mr. Deputy Speaker:** Order, hon. Members! Hon. Bifwoli deserves to be heard! Order! Hon. Members, you repeat that and you will miss the rest of this debate for the afternoon. Every Member of Parliament here represents a constituency as equal as the other one.

**The Assistant Minister for Lands** (Mr. Bifwoli): Mr. Deputy Speaker, Sir, let me thank you sincerely for seeing me, so that I can contribute to this very important debate.

I want to be very honest that Kenyans  have yearned to have a new Constitution for a very long time. They have yearned for this document for more than 20 years. But that does not mean that we accept this draft blindly because we have been yearning for it. We must accept and analyze it. We must criticize it. Those who are for and those who are against the Draft Constitution must be ready to listen to each other. Those who have different ideas must compare notes. First, I want to thank the Kenyans who gave their views. I am not sure that all the views were incorporated in this document. If they were, there are certain views which we do not know where they came from.

From the outset, I will support this document only with amendments. There are certain sections which I do not believe in. I do not want anybody to threaten me. At my age, I am ready to die and do anything.  So, this Constitution alone will not make me fear the statement that "Kenyans want". Who are these Kenyans? Who am I? Am I not a Kenyan? So, remove the idea that "Kenyans want". Who are these Kenyans? If they are a million, I am one of them. I am prepared to be heard. We need to do a lot of amendments. This document is just too bulky. Is it an encyclopedia for people to read or a Constitution for us to use? A Constitution should have straight forward statements and properly constructed English sentences. But this is garbage. There is a lot of nonsense in this document. When we say we want this draft to be amended so that it is edited, we are saying so, in good faith.

Mr. Deputy Speaker, Sir, if I may take you through the document you will see why I am not convinced to support it blindly. First, the document says that there shall be no State religion. At the same time, there is a contradiction that there are going to be certain religions. I want us to say that Kenya will be a multi-religious State so that Catholics or people of *Dini ya Msambwa* have their own courts. If we confess our faith we should be allowed to have our courts. You do not know what we Catholics do on the issue of marriage, burial and how we share our property or how the M*sambwa's* do their things.

With regard to culture, the document says that no man shall be forced to practice any culture. I am imagining that man is my child. That same man that you are referring to is my son. Where I come from, there is no man who has fathered a child who can be buried uncircumcised. Suppose I want to circumcise my child, so that I avoid the embarrassment of tomorrow, what will happen? If this young man dies, he will be circumcised before he is buried. I would rather circumcise him alive because any man who circumcises the dead is not allowed to circumcise the living. I am wondering how many people will volunteer to circumcise my son who feared the knife when he was alive! If you circumcise the dead, you will not be allowed to circumcise the living, who have more market than the dead. Where I come from, there are very few men who are circumcised when they are dead. We circumcise those who do not want to as long as they belong to our community. A man who is born a Bukusu, has no choice, but must be circumcised.

Why were you born a Bukusu if you do not want to be circumcised? You go where you want. I hold this one with passion. Why should you legislate against the culture of the people? Surely, it is wrong. We cannot say that Kenya is a non-religious state.  Culture is a religion to some of us. We believe in our religion. How can you legislate against my religion?  For example, if today you say that I am not allowed to receive the Holy Communion, why should I then go to church if I am not going to receive the Holy Communion? Why am I a Bukusu if I am not circumcised?  You can never be a Bukusu unless you are circumcised. We do not circumcise women. But if you are targeting women, you should have put it there that no woman will be circumcised and I would have supported you. But when you leave it blank like that, I will not support you.

Mr. Deputy Speaker, Sir, when you look at page 20, there is the Bill of Rights. This is terrible! I do not know how you will work on it. It says that every person has a right to life. That is the truth. Do you know when life begins? I went to the major seminary to train as a Catholic priest between 1961 and 1962. I left the seminary in 1975. I was told that before God put me in my mother's womb, he knew me. He even knew my name and what I was going to be in this world. In other words, life started with God before he put me in my mother's womb. Now, if that is what I believe in and some people are saying that life starts at conception, surely--- God knew me before my mother and dad met, yet you are telling me that life started when my mother and dad went to bed. I do not believe that because God told me that he knew me before I was born. It was my right to be born and not my mother's decision to give birth to me. It was my right and that is why God put me in her womb.  Her responsibility was to carry and bring me to this world, and not to terminate me at will. You must delete this. This idea of abortion is not there. Why should you have appetite if you are not ready to chew something that you can carry? Those who do not want to reproduce do not have sex. That is the truth. Why do you have it and at the same time say that you do not want to have a child? What were you looking for when you went to bed?

*(Laughter)*

Mr. Deputy Speaker, Sir, when you go further, Clause 30(2) says that a person shall not be required to perform forced labour. I am a teacher by profession and I am sure there are some of my students here. I do not want to name them, but I actually slapped

them to read hard. If they came late, I gave them manual labour to work in the school garden. That is how some of them ended up being doctors and Members of Parliament. Today, you are giving a blank statement that no person is required to perform forced labour. What will we do with prisoners or people who have committed crime? They go to prison to be rehabilitated, they must work. Now, when you give us a blanket condition that nobody is allowed to perform forced labour, if you are not supposed to work, then we should behave well in this country. We are not going to have heaven in this world.

Mr. Deputy Speaker, Sir, there is another very interesting provision that every Kenyan is entitled to eat and have a free house and health. When God created us, in Genesis, he said that every man must eat from his own sweat. Now we want men in this country to eat free. At whose sweat will they do so? My brother, people will stop working. We will have a nation of lazy men and women. This should be discouraged. If you really wanted these things, why not put it in statutes, so that when things become very difficult we can amend. They have said to amend anything in the Bill of Rights; it must go to the Referendum. I suspect lazy men are more than hardworking men. It is by nature. People who are idling are more than those who go to farms. If you have ten children, how many volunteered to go to the farms? Out of you ten children, maybe two go to the farms without being told. Others, you must whip them. Now you are saying a country of 30 million, how many will volunteer to go and work for the lazy. I am wondering. Do you say we support this blindly because PNU and ODM say so? Mr. Bifwoli will say no! Whether it is PNU, where I belong, I will tell them: No! Those who know me—

**Mr. Pesa:** On a point of order, Mr. Deputy Speaker, Sir. Is it in order for the hon. Member to mislead this House by quoting that it is God who created people to work hard? Actually, I think it is during Adam's time that he should have quoted?

**The Assistant Minister for Lands** (Mr. Bifwoli): Mr. Deputy Speaker, Sir, if the hon. Member believes that it is not God who created him, we shall meet on the judgment day and he will tell God who created him. I am telling him that it is God who created me. Therefore, if you deny that it is not God who created you, I will ask you on the judgment day, who created you?

Mr. Deputy Speaker, Sir, let us look at Article 35, it says:-
"35. (1) every citizen has the right of access to—
(a)     information held by the State;"

I used to be a headmaster of a school. I had a desk and cupboard, where I kept secret information about some teachers. When I saw a teacher smiling at a child, I used to write in his personal file and lock it under the desk. Here, I am being told even if I see a teacher smiling to a child, he has the right to know what I have written about him. What about criminals who are citizens of this country and want to know the secrets of the Government. What shall we do? Surely, let us be reasonable ladies and gentlemen. These are things that we should jointly delete, so that we give Kenyans a good Constitution. The fact that Kenyans have been yearning for a good Constitution we cannot give them a bad one like this one.

(b) "Information held by another person and required for the exercise or protection of any right or fundamental freedom"

I am imagining that I have some information held about you and you have a right to know what I am thinking about you. This is my interpretation as English teacher. I am dealing with it as a teacher of English. I am not dealing with as a lawyer.

Mr. Deputy Speaker, Sir, let us look at Article 37. It says:-

"Every person has the right, peaceably and unarmed, to assemble, to demonstrate, to picket, and to present petitions to public authorities"

Every person means an army, a police, a teacher and an MP. I am imaging a situation where MPs will picket, even some of us honourable as we are.  We will go to the street and demonstrate. It is saying every person, it is not classifying which type of people should go on strike.

Look at Article 41 on Labour Relations. There are some people given the nature of their employment; are not supposed to join trade unions.  These are people like doctors, nurses, managers, police and people from the security forces. But here they have said every person has a right to fair labour practices to form, join or participate in activities and programmes of a trade union and even to go on strike. I am imagining the day the army and the police will go on strike. How will this country look like?

**Mr. Mbadi:** On a point of order, Mr. Deputy Speaker, Sir. Even though Mr. Bifwoli is really bringing out a very good argument, but I want to remind him that Article 24(5) does not allow the police to go on strike.

**The Assistant Minister for Lands** (Mr. Bifwoli)**:** Mr. Deputy Speaker, Sir, is he on a point of order or he is informing me?

**Hon. Members:** He is informing you.

**The Assistant Minister for Lands** (Mr. Bifwoli)**:** No, Mr. Deputy Speaker, Sir, before I respond, is he on a point of order or a point of information?

**Mr. Deputy Speaker**: He is on a point of order---

**The Assistant Minister for Lands** (Mr. Bifwoli)**:** And instead he is---

**Mr. Deputy Speaker**: Order, hon. Wakoli! Indeed, when you say every person when there are other provisions and articles in the document--- There are two provisos on that. There are limitations on that! It does not include members of the disciplined forces.

So, proceed!

**The Assistant Minister for Lands** (Mr. Bifwoli)**:** Mr. Deputy Speaker, Sir, such information should have come under an Act of Parliament and not in the Constitution. That is because those people will have the right to ask and to refuse. Let us look at Article 68. It says that Parliament shall enact legislation to prescribe minimum and maximum land holding acreages in respect of private land. Surely, when it comes to the matter of land, and we want to put it in our Constitution that the minimum one should have, for example, is two acres--- If I do not have the two acres, where will I get the two acres from? If the maximum parcel of land that one should have is 10,000 acres or 1,000 acres, if I have 100,000 acres, where do you take it? Suppose there are men and women who have more than 100,000 acres, will you take their land peacefully, or are we looking at a situation where we are going to have chaos in the name of a new Constitution?

Mr. Deputy Speaker, Sir, I want to finish by saying that I will only support this Constitution on condition that there are amendments. Those amendments will be carried out without name calling.

*(Several hon. Members stood up in their places)*

Mr. Deputy Speaker, Sir, I do not know why they are standing up and my time has not expired!

*(Laughter)*

**Mr. Deputy Speaker**: Order, hon. Members!
Proceed, hon. Wakoli!

**The Assistant Minister for Lands** (Mr. Bifwoli)**:** I think, Mr. Deputy Speaker, Sir, one, it is because they were not willing to hear my voice. Now, they are even getting tired with my voice and I am entertaining them! I can see that they are very happy. I wish they listened to me a little longer.

With those many words, Mr. Deputy Speaker, Sir, I stand to say that I will only support this Constitution, but with amendments.

**The Minister for Higher Education** (Dr. Kosgei): Thank you, Mr. Deputy Speaker, Sir. First of all, I would like to say that I do support the document as it is, but with amendments.

Mr. Deputy Speaker, Sir, the history of making any constitution anywhere in the world is always difficult. In Kenya, we have taken a long historical route to get to where we are today. Therefore, it is very important for us to say what we think about this Constitution and try to resolve what we can resolve in this House before we go to do street battles like it happened in the year 2005.

Mr. Deputy Speaker, Sir, when you look at the document done by the Committee of Experts, I, who participated from the Parliamentary Select Committee's point of view feel that they have done a good job. In my view, they have done a good job. This Constitution is supposed to be for posterity, and from that point of view, they have done a good job. Our opportunity now is to make it a better Constitution than what they have given us in draft by contributing and actually debating on what we think we can improve on here, rather than keeping quiet and going outside to oppose a draft that has gone through this House.

Mr. Deputy Speaker, Sir, there are, of course, several things that one can look at, and which are a bit difficult. But, first of all, I am disappointed that hon. Wakoli has left after telling us how he arrived in this world, because I wanted to tell him my point of view.

The whole concept of abortion is a very emotive matter. I know that nobody is saying that they want to legalise abortion. As far as I know, in medical terms, when you talk of termination of pregnancy for whatever reasons, even medical ones, it is called "abortion". So, let us study that carefully because I would have liked to ask my wonderful teacher friend what he would do if his daughter was going through a miscarriage and a doctor would not touch that child because he would be prosecuted just because, legally, in the Constitution, we have said that we cannot terminate a pregnancy which is even on its way out. I support Mr. Bifwoli but I want others to look at this matter quite seriously and make a legal provision for a situation that is proved to be medically necessary. Otherwise, the doctors will not touch the patients. Whoever will take a person who is on the verge of a proper miscarriage to the doctor is liable to be arrested and prosecuted.

Mr. Deputy Speaker, Sir, there are some other things which are in this Constitution. For example, the way we think about women in our country. I see this everywhere. There is a tendency to trivialise what women can do in our society hence the need by many people, especially, the human rights activists, to fight for women to have positions in politics. We have proved beyond reasonable doubt that as lawyers and public servants, we have done well.

Kenya, which has been a leader in development, lags behind when you look at what women are doing in politics. So, it was suggested some years back that we should have some type of affirmative action. In Naivasha, we discussed and decided that we should have 47 counties. My plea to my colleagues is that we should give an opportunity to women to be present in our political system by allowing those 47 counties or more, if the number of counties goes up, to compete amongst themselves and come to Parliament so that we can have enough numbers here. We no longer should have a situation where people think that we are so funny that they can photograph our legs and so on.

Mr. Deputy Speaker, Sir, I stand here to say that we should have this for the women. I am one of those women, like many of my colleagues here, who believe that "I can run for an election and win." However, that is not to say that other women will be able to do the same. In the sunset clauses, we said that we wanted this to happen for only 20 years and after that it goes back to the usual system. I think my colleagues should continue to support that for us.

There are issues in this Constitution which even though we support, we know will cause difficulties. A few people, including the last speaker have mentioned it. I am talking about land. Land is private property. If we have different legislation for land as we do for private property, we have to really come up with a very good reason why we want to say that if you have this amount of land it will be taken away from you. Of course we recognise what has been said constantly by the Ministry of Lands; that there are people who hold large tracts of land in Kenya and yet they are not even citizens. We know that there are some countries in the world, advanced as they are, where you cannot buy property. So, we must have some way of dealing with that but without taking away the respect for private property. Once that is done, it messes up with the banking sector and the right of an individual to own property as we have in the Bill of Rights.

Mr. Deputy Speaker, Sir, when Kenyans said that they wanted a new Constitution all these years, their desire was mainly centred on demystifying the presidency. In other words, we constantly said that we did not want a President who was altogether too powerful and who could do whatever they wanted. We have now gone round, have argued, discussed at Naivasha and in this House and even through various caucuses. We have come down to a presidency which we support. However, in order for this not to be an imperial presidency, we must be very serious about checks and balances.

We have constantly spoken about the Senate and watered it down. We constantly said that we want one centre of power and not two centres of power. Fair enough! The Draft Constitution provides for one centre of power which I support, but in order for us to remove the fear from Kenyans that a member of one's community must be the President for one to access anything, we have to look at the checks and balances so that whoever becomes the President of Kenya tomorrow, does not distribute resources as he or she wishes.

Mr. Deputy Speaker, Sir, the devolution process that we have talked about was, furthermore, to remove the fear of having one person at the centre of power. This concept of devolution was very much misunderstood. During the referendum in 2005, it was thought to be a way of bringing back the *Majimbo* of Lancaster House, which, unfortunately, was "murdered" in 1964. The devolution we speak of is that of sharing power in some way in order to give people the opportunity to participate in the governance of their country.

If we feel that creating more regions will bring more divisions in our country, then we can reject it. What I feel, which is what other people also feel, is that since we already have eight provinces, why do we not stay with them? The Draft Constitution, I think in Article 17 of the sunset Articles says that the current Provincial Administration will be re-organised to manage those provinces in a devolved manner.

Mr. Deputy Speaker, Sir, if we look at that provision more soberly, I do not see why the existing eight provinces, which have never threatened us, should threaten us now. The reason as to why we resented the retaining of these provinces at the beginning had to do with the fact that they degenerated into an arm of one office. They also became areas where we went to discuss security rather than what happens to the resources and how to devolve those resources.

As some people have said, we do not want to create new centres that will have more bureaucracy. In this particular case, in limiting ourselves to the regions that we already have, with the structures we have, we can move further. However, devolution is only part of it. What we must really think about seriously is, if we do not want the regions that we suggested--- In Naivasha we came up with 18 regions. We listened to all of you and other people who said: "These regions will divide the people. Please, bring back the counties as they were in Bomas."

Mr. Deputy Speaker, Sir, we went back to the record of the Bomas process and looked at what everyone had said and came out with the counties. I think the CoE went ahead with that as our suggestion and also because of the historical journey that we had taken in writing this Draft Constitution. Now that we still have those counties in this Draft Constitution, my view would be that we can make them workable as a level of devolution. I feel that this way, we will satisfy those people who are afraid of a centre that is too far, too unreachable and too powerful. This is one way of trying to demystify the concept of the presidency.

When we speak about devolution we are, of course, seriously thinking not only of an imperial presidency, but we are also thinking of how we can get equity in distribution of the resources of this country. I know, for example, that when the KCPE results are released, we celebrate about how this student has done well; this is the top girl in the country and this is the top boy in the country, but we never ask ourselves one question: How is it that some regions cannot do as well as others? It is because if today you are in class seven or eight in Nairobi, you should be able to use a computer and go to the internet. If you look at a child somewhere in Wajir or Kilifi, you will find that they do not have those resources. Those schools have a lot of difficulties.

Mr. Deputy Speaker, Sir, some of us are trying very hard to build schools now. In some parts of this country, they no longer build schools because they have permanent classrooms. We cannot say that it was the Members who represented them who did not use the resources properly. It is simply who was closer to centre or who was closer to the

power that was there at that time. It is for that reason that some of us feel quite strongly that in a devolved system, we must devolve resources in a manner that they do not get swallowed up through the bureaucracy. To avoid creating more bureaucracy, I suggest we use the system we have modified as suggested in the Draft by the Committee of Experts (CoE). That way we are no longer afraid that we will remain with a situation which is creating more bureaucracy and, therefore, reducing all the funds that we will take to the devolved Government to recurrent expenditure.

We want to save those funds for development. We want to save those funds to improve our education system. We want to save those funds so that we have roads. There is no justification for some area like my constituency which has a productive climate not to get their food to the market because we do not have good roads.

Mr. Deputy Speaker, Sir, somewhere in the not too distant past, we got more districts. Today, there are districts which have no hospitals. I know that the Minister for Medical Services keeps talking about that in the House. He has been talking about resources. If we had devolved funds, we would try, as people in those areas, to use every other effort to boost those resources and have hospitals so that our children do not have to cover several miles to be treated for a disease as simple as malaria.

Consider a woman who goes into labour in those areas with no hospital around. If there is a serious crisis, she will lose the baby or her life. This is one of the reasons we feel we should have devolved funds. If you believe that centralized funds are working, then we should ask ourselves what happened in the nearly 50 years that we have been independent and followed the system we have now? That requires us to change the way we do business.

Mr. Deputy Speaker, Sir, the ordinary Kenyans must have noticed this when they insisted and talked all the time about the need for a new Constitution. I hope that my colleagues here understand that people still believe that it is the politicians who are blocking the new Constitution. I do not think so and all of us should tell them that we would like to get a new Constitution. However, it should not be a Constitution for the Constitution's sake. We must have a Constitution that will make a difference in the way we govern and run this country.

Thank you.

**Mr. Deputy Speaker:** Mr. Dan Mwadzo!

**The Minister of State for Public Service** (Mr. Otieno): Thank you Mr. Deputy Speaker, Sir, for giving me this---

**Mr. Deputy Speaker:** Order! Mr. Dalmas Otieno, I do not know when you changed your name to Dan Mwadzo!

*(Laughter)*

Mr. Dan Mwadzo, please, continue!

**Mr. Mwakulegwa:** Asante Bw. Naibu Spika kwa kunipatia nafasi hii ili mimi pia nitoe mchango wangu kuhusu Katiba tunayoitengenezea Wananchi wa Kenya.

Kwanza, tumechukua muda mrefu kutengeneza Katiba hii na wakati ni sasa na Bunge la Kumi lina nafasi ya kuweka historia kwamba tumewasaidia Wakenya kuwa na uongozi mpya na Katiba mpya.

Bw. Naibu Spika, Ninapoangalia katiba, mambo ya uzito ni mawili, kwamba katiba ni kuangalia uongozi wa siasa na utawala, na ya pili, ugawaji wa rasilmali ya nchi hii. Kwa hivyo, kila wakati tumezungumza na kila wakati wa uchaguzi kumekuwa na utata kuanzia mwaka wa 1992, kwa sababu tunaamini kama Wakenya kwamba Rais akitoka kwa jamii yako, basi rasilmali zitakuja kwako. Hiyo ndiyo maana tumekuwa na utata, na hata mwaka wa 2007 kukawa na umwagikaji wa damu kwa sababu tunapiga kura kwa jamii kwa sababu rasilmali zitakuja kwa jamii yako. Tuna nafasi nzuri ya kurekebisha mambo haya. Makabila yote ya Kenya yameumbwa na Mwenyezi Mungu kuwa hapa kama Wakenya. Hata uwe Mtaita, wewe ni Mkenya na ujivunie kuwa Mkenya. Demokrasia inasema kwamba, wengi wape lakini wale wachache wapate haki yao.

Mimi naangazia mambo mawili katika Katiba hii; uongozi wa siasa, wengi watachukuwa. Lakini wale wachache pia wapate rasilmali sawa na wale wengi. Tukifanya hivyo, uongozi na Serikali ile inaweza kutusaidia kutekeleza mambo hayo ni Serikali ya ngazi tatu. Serikali ya Kitaifa, Serikali ya Mikoa na Serikali ya Wilaya. Kwa nini ninasema ngazi tatu? Ni kwa sababu kwa hii miaka 47 tunaangalia serikali ya kitaifa ambayo inagawa rasilmali zote; iwe ni barabara hata mashamba, zote zinatolewa na Serikali ya Kitaifa. Ndiyo maana kumekuwa na utata nchini Kenya. Kumekuwa na wale wachache wakisema: "Keki hii yaliwa na wachache". Wale wachache hawawezi kupata nafasi ya kuweka Rais pale. Ndiyo maana ninasema kwamba, tukienda katika Serikali ya ngazi tatu na tuwape mamlaka kila ngazi; kwamba ngazi ya katikati kama ni ya mikoa, iwe na nafasi ya kuangalia rasilmali za mikoa kama vile mashamba na rasilimali zingine zote. Basi ile wilaya pia itakuwa na nafasi ya kuchunga mali yao. Kama ni mashamba yao, au maji.

Bw. Naibu Spika, tukifanya hivyo na tugawe kwa usawa, mambo ya lazima kwamba Rais atoke katika jamii yangu haitakuwa tena na nguvu maanake hata mimi ninayetoka kwa jamii ndogo ninajua haki yangu naishikilia mimi, na rasilmali zangu nazichunga mimi. Kwa hivyo, ni muhimu sana. Tunapozungumza tuwe na ngazi tatu katika mamlaka ya kujiongoza sio eti Serikali ya kitaifa inapuuzwa; hapana. Itakuwa na mamlaka yake. Serikali ya mikoa itakuwa na mamlaka yake na Serikali ya wilaya ni ya jamii ya wananchi wanaoishi katika wilaya ile pia wawe na msingi wa kujitawala.

Jambo lingine ni kwamba, tusipokubali kwamba sisi ni watu tofauti na jamii mbali mbali; tukiwa hapa tunasema sisi ni Wakenya, lakini tukitoka nje, kila mtu anazungumzia kabila lake, itakuwa ni  vizuri tukubali sisi  ni watu mbali mbali na tugawe mali katika hali hiyo. Pia, katika Katiba Kielelezo ambayo tunaizungumzia hivi sasa, ukiangalia kipengee cha 89 kinasema kwamba, uwakilishi Bunge kwa sasa utagawanywa kulingana na idadi ya watu. Kwa mfano, kama tuko milioni 40 na maeneo Bunge mia 290 inaonekana taratibu ni kwamba kila eneo Bunge liwe na watu 138,000. Kwa hivyo, tukitumia idadi hiyo, kuna maeneo Bunge mengi sana ambayo yatapotea katika ramani ya Kenya. Kwa mfano, kule Pwani tukitumia idadi hiyo, kuna maeneo Bunge saba yatakayopotea. Kwa hivyo, tunasema kwamba, kama tutatumia idadi ya watu, tutumie idadi ya watu kulingana na misingi mitatu.

 Msingi wa kwanza ni maeneo katika miji mikuu, ya pili ni maeneo kwa watu wengi na ya tatu ni maeneo ambapo kuna idadi ndogo ya watu lakini yana eneo kubwa la ardhi. Tukifanya hivyo, tutakuwa na usawa. Maanake, tukitumia idadi ya watu pekee yake,  baada ya miaka nane ama 12, basi tutakuta maeneo Bunge fulani  yatakuwa

yanaondoka katika ramani ya Kenya, na wale wengi wataendelea kujiongezea viti vya Bunge. Kwa hivyo, hapo ndipo tunasema haitakuwa ni sawa. Wachache pia ni Wakenya, wasikizwe na waishi katika nchi hii katika hali ya ustaraabu na raha wanazopata kama Mwanakenya mwingine.

Ni maombi yangu kwamba wale wachache ambao kawaida hawawezi wakapata uongozi wa nchi hii--- Nazungumzia kabila kama Mkuria, Mtaita na Mteso. Itakuwa ni vigumu sana katika Katiba hii tunayopendekeza awe rais wa Kenya. Lakini ikiwa kwamba tutaenda katika ngazi tatu, basi katika wilaya yangu najua nitasimamia rasilimali yangu. Katika mkoa wangu, nitaweka gavana wa kuangalia masilahi yangu. Tukifanya hivyo, mambo ya ukabila tutafuta katika Kenya hii na yale mengine yatakuwa yanaweza kushawishika bila kuzusha utata na umwagikaji wa damu.

Bw. Naibu Spika, la mwisho ambalo nataka nizungumzie ni kwamba katika Katiba hii, kuna utata mdogo pale na pale kama vile ndugu zetu Waislamu wanavyochukulia Kadhis' court. Zimekuwepo tangu wakati wa Uhuru na nimezaliwa Mombasa na nimeishi na Waisilamu na nina marafiki zangu Waisilamu. Haijawahi kunihusu kwamba wana korti na sheria zao. Leo hii kwa nini twataka tulete utata na wana Kenya wale wachache? Maanake tukiangalia Wakristo, tuko wengi na Waislamu ni wachache. Mbona twataka tuingilie kile kitu ambacho hakituhusu sisi? Waswahili husema: "Pilipili usio ila yakuwashia nini?"

Mambo yale mengine ambayo tunataka tuyalete kugawanya wananchi wa Kenya ni misingi ya kusema kwamba: "oh, mimi najua maisha ya binadamu huanzia wapi!" Kila mtu ana dini yake! Mtu wa dini nyingine atakwambia kabla hajazaliwa kulingana na dini yake, ilikuwa inajulikana atazaliwa. Wengine wanajua ukidunga mimba ndio maana unazaliwa. Kwa nini tusiondoe kipengele cha kuwezesha watu kutoa mimba ili watu wote waone masilahi yao yanashughulikiwa na Bunge la Kumi ili tupate Katiba mpya? Tukisema kila mtu anakita; anasema huyu si sawa, mimi ni sawa, tutafika wakati pia tukose nafasi ya Bunge la Kumi kutoa Katiba. Naonelea, sitapoteza wakati mrefu. Tukiangalia vile nimesema, tufanye ugatuzi na tuchukulie maanani ya wale wachache. Kama ni Waisilamu, tuwape haki yao na kama ni Wakristo wale wengine tuondoe vipengele hivyo ili jina langu kama Mbunge wa Voi liingie katika historia miaka 50 ijayo kama siko katika dunia hii, jina langu pia la Mr. Dan Mwazo liwe pale kama Mbunge ambaye aliwezesha nchi ya Kenya kupata Katiba mpya. Nawaomba ndugu zangu tuunge mkono na marekebisho machache ili Katiba hii tuipatie wana Kenya na wana Kenya wawe na Katiba na sheria mpya ya kujitawala.

Kwa hayo machache, asanteni!

**The Assistant Minister, Ministry of State for Defence** (Maj-Gen. Nkaisserry): Thank you, Mr. Deputy Speaker, Sir, for giving me this opportunity to contribute to this very historic Motion.

I would like, at the very beginning, to thank Members of this august House for giving me the opportunity to serve as a Member of the Parliamentary Select Committee (PSC). As a Member of that very important Committee, we looked at the document and I think we arrived at some consensus. It is a fact that Kenyans have waited for far too long - for almost two decades - to get a new Constitution. Success is about failing nine times and getting up ten times. This is our opportunity in this House. We must give Kenyans a new Constitution. It is also a fact that this House is part of the constitutional-making

process. Equally true is that the new constitution will be a new beginning for Kenyans. It will change Kenya for the better.

Mr. Deputy Speaker, Sir, we have lived for the last four decades in danger and the new constitution will be the refuge of our citizens. The new constitution will get rid of ethnicity, nepotism, corruption, poor leadership and all manner of evil. So, we must give Kenya a new constitution.

We have not managed, as a country, to get rid of the primitive structure of ethnicity. This new constitution will enable us to do so. We also know that the unity of Kenya is not yet complete. This new Constitution will make us achieve it. However, we cannot give Kenyans a bad constitution. This House has a duty to improve this constitution for the sake of national interests.

There are quite a number of articles which need to be improved. One of them is the Chapter on the Bill of Rights. When you look at Article 24(5), it has excluded other uniformed services such as prison warders and the KWS wardens. We need to bring them on board.

Mr. Deputy Speaker, Sir, when we look at the same article, it did not include Article 50(2). It should have brought the limitation as far as the armed forces is concerned. This is an area of fair hearing.

There are quite a number of summary jurisdictions which commanding officers are able to deal with. If you allow all disciplined forces access to the High Court--- If somebody commits a crime of negligence, a very basic insubordination, failure to perform military duties or going away without official leave, you want that to fall under appeal in the High Court. If that is the case, we will lose command and leadership of the disciplined forces.

When you look at the article on land, that is Article 1(a), there will never be equitable access to land. We are never the same. It is like the fingers of your hands. There is no way you will have ten acres, I have ten acres, you have five acres, I have five acres. It is not possible. That needs to be clear.

In Article 62(g), you want to take that community land to the national level. This will not be acceptable with certain communities. We need to look into that. Many of my colleagues have alluded to Article 89 on the issue of representation. This is very important and we need to take all aspects into consideration so that this article can see the light of the day.

When you look at Article 192, it states that the President has the power to suspend the county government or whichever devolved government will be in place. We need to put a rider that: "With the approval of the Senate". That is the only way we can have checks and balances.

Mr. Deputy Speaker, Sir, with regard to the national security forces, Article 238(2)(d) says: "the recruitment of the Armed Forces will be on equitable proposition". This cannot happen. Security forces are voluntary. So, if you are going to take communities, the bigger communities will always take the lion share. This cannot be a national security organ. So, when we look at Article 239(1), we need to add (d) to say: "Other security forces". It is very important that we bring that on board. Under Article 241(2)(d), we also want to include the Armed Forces constabulary and the reserve. We need to bring that on board as well.

When you look at Article 242, you will find that we have left it hanging. The command of the National Security Intelligence Service (NSIS) is lacking. Yet we have included a State officer, namely, the Director General of the NSIS. So, we need to put in a sub-article (3) to include the command of the NSIS. When you look at Article 24, it says: "other police services". I would rather that Article say: "Other uniformed services", so that we can bring everybody on board. This new Constitution will address our suspicions and worries.  If we do not agree on the level of devolution and whether we go for provincial governments and 74 counties or for 47 counties, it is important that, that disagreement should not be an impediment or an obstacle to deny Kenyans a new Constitution.

The minority communities in this country have been given a raw deal ever since this country attained Independence.  So, devolution of resources of 20 per cent to the counties and 10 per cent to the constituencies will be the most ideal way to go. It is a lot satisfying if you aim to reach for the stars and then you end up landing on the moon. This time round, we aim to get a new Constitution and we must get it. We must give Kenyans a new Constitution. It is this House which must approve the amendment.

With those few remarks, I beg to support.

**Mr. M'Mithiaru:** Thank you, Mr. Deputy Speaker, Sir, for giving me the opportunity to contribute to the Motion on this Draft Constitution.

Mr. Deputy Speaker, Sir, Kenyans have waited for this Constitution whose journey started a long time ago. Kenyans are fatigued to ensure that they get this Constitution. Let me take this early opportunity to thank the Members of the Parliamentary Select Committee who in their own wisdom, in the Naivasha Retreat, agreed and did Kenya proud. They gave hope that at long last the Constitution is in view.

*[Mr. Deputy Speaker left the Chair]*

*[The Temporary Deputy Speaker
(Prof. Kaloki) took the Chair]*

Mr. Temporary Deputy Speaker, Sir, it has been a long journey and we now see light at the end of the tunnel. Where we have come from and where we are now, we have gone too far. It would be too expensive now to go back or retreat. It is easier to complete the journey and give Kenyans a constitution. The hon. Members in this House are the ones who are going to ensure that the journey that we started on constitution making is complete. Already, we have seen that Kenyans have done their part in terms of giving views. The Committee of Experts (CoE) and the Parliamentary Select Committee did their part. Indeed, when the Parliamentary Select Committee did its part and returned the document to the CoE, the CoE even did some further amendments. It is on that score that I would say that we had a retreat at the Kenya Institute of Administration (KIA), where we went through the document and we are now more informed than we were before. So, we are in a position to contribute effectively from a very informed position. Knowing that the Constitution is for posterity and Kenyans, then as Members of Parliament, we have to look at it in its current state now – in the Draft form – and then ask: What do we do? The CoE even did some amendments when they got the document from the Parliamentary Select Committee. So, also, as Members of Parliament, we cannot just take it for granted

and pass it. We must critique because this is a document for posterity. It is not a document that we should just pass and forget about it. It is a Constitution that is going to govern all Kenyans for the next 100 years or so.

Mr. Temporary Deputy Speaker, Sir, it is on this score that I would say that the start of this Constitution may be likened to what the Americans called the bell of liberty. This is our bell of liberty and we must ensure that we give Kenyans the best. If we have to give Kenyans the best, then also we must not allow any loophole or mistake to pass under our watch. In the area of representation, Article 126, the National Assembly will consist of elected Members of Parliament, 47 special seats for women, 12 Nominated Members of Parliament and the Speaker. That requires an amendment. With due respect to our ladies, the ladies today in Kenya are so informed that we do not really need to entrench an affirmative action in the Constitution for this. In any case, affirmative action is not a principle of Constitution making, because the Constitution itself presupposes that everybody is equal. To affirm that further in the Constitution is like creating two worlds. So, if there is any affirmative action, it must be a creature of an Act of Parliament but not the Constitution.

Mr. Temporary Deputy Speaker, Sir, I have my own daughter who has done examinations and she has beaten all the boys in her class in Form Four. She got grades "A" in all subjects. If that is so, we cannot now say we create a constituency where women will be competing alone. No. In fact, they have more brains than men. So, why do they go to that subdued level? They are beyond that. If they are beyond that then, what I am saying is that I will be bringing an amendment to that particular Article to ensure that we give women a nice level playing ground to compete effectively with men. This has even been proven in this House. It has been proved that in Kenya women got liberty long time ago. If I may go down the history lane, in Central Province, we used to have a lady leader called Wangu wa Makeri. It was that long time ago. In the Rift Valley, even before Beijing, we had hon. Chelagat Mutai who was a Member of Parliament. In Meru we had a lady called Elnina Karimi, in early 1970s before Beijing. In Kisumu, we had the first lady who is Grace Onyango, that early. So, we are not saying that our women are not there. They are already in the know. They are already in the race and they are able and capable to properly compete with men.  Should I now tell my daughter who is beating all the boys; now, you are a lesser being, you can compete with ladies only"? No. This is not a race where we have ladies only or high jump to have ladies only. This is a political race where ladies are properly endowed even to be the President of this country. They should play their role at that level.

Mr. Temporary Deputy Speaker, Sir, my other contribution that will really require an amendment is on the counties. If we are to have equality, proper representation and a meaningful devolved Government, then the 47 counties are not enough. So, this is an issue that also should be looked into. In the area I come from, we in Meru North require our own county.

Another area is the public finance. When I look at this document, I see that there are very many pages, almost 20 pages on public finance. This is a Constitution. As somebody said, a Constitution should only give guidelines. It should give the underlying principles so that an Act of Parliament can pick from there. But so long as we close ourselves by putting everything in the Constitution, what we are saying is that we are drawing a Constitution that will make almost everything impossible because to change

even a small area on operation, it will be a Constitution. That is why it is necessary to ensure that we provide only what was principally agreed and leave the details to be captured in an Act of Parliament.

Lastly, the Constitution we are drawing, with due respect is actually a Constitution at the same time an appendix of so many Acts of parliament. So, I would say that some articles in this document, like the area of finance; we should ensure that it is properly abridged so that it provides only the guidelines. The area of finance is very dynamic, especially in this period of technological change. We do not want to anchor something in the Constitution, which tomorrow, we shall have a lot of problems with, especially the Budget making process. It should be simple. It should ensure that whoever is responsible for the Budget making process will have it easy. But when something is anchored in the Constitution, then it becomes very difficult to amend.

With those few remarks, I support.

**The Assistant Minister for Forestry and Wildlife** (Mr. Nanok): Thank you, Mr. Temporary Deputy Speaker, Sir, for "seeing" me so that I can make my contributions to this great debate. Basically, what we have in front of us is a document, the Draft Constitution; a matter that has been in the public domain for the last 20 years, and which we have not been able to agree on previously. In 2005, after coming up with the Kilifi Draft, it went to the referendum and could not marshal the required numbers for it to be approved. Then, we were back to the drawing board. So, as Kenyans and as this Parliament, we have got another opportunity now to be able to do this document and make sure it goes through so that it can be there for posterity.

Mr. Temporary Deputy Speaker, Sir, you have to realize that there have been so many levels of discussing this document. We had the people themselves providing their views; we had the Committee of Experts putting these views together; we had the Parliamentary Select Committee also making changes to this draft and, now, it is the turn for Parliament to be able to look at this draft.

Mr. Temporary Deputy Speaker, Sir, Parliament is not a rubber-stamping institution. We are not here to rubber-stamp what others have done. The last two weeks have actually indicated that there are, indeed, certain sections in this draft Constitution that need to be amended. If we are amending it for the betterment of this country, so be it! I, as an hon. member from Turkana, being in this House and participating in the amendments that will be brought on the Floor of the House, do not feel ashamed that we can be able to make amendments. So long as those amendments are credible, they can be justified and they can be able to meet the two-thirds threshold that is required. So, I will only urge hon. Members to forget about the noise that we are hearing from outside that we should not change this draft as it is. Where it is necessary, let us change it for the betterment of this country. We will have played our role.

Mr. Temporary Deputy Speaker, Sir, this Constitution is being made to protect all Kenyans of all shades; young and old, men and women, black and white and, particularly, all the 42 tribes of this country. We are making a Constitution that will ensure that their rights and fundamental freedoms are not only protected, but they are going to be observed. I am, therefore, glad that Chapter 4 on the Bill of Rights is not only elaborate, but gives the citizens of this country inalienable recognition to hold accountable the constitutional and governance institutions which this draft does establish. However, there

is need to strengthen the chapter on the Bill of Rights so that some of its provisions are not used to abuse the same rights as granted.

Mr. Temporary Deputy Speaker, Sir, I give the example of Article 45 (2), which says:- "Every adult has the right to marry a person of the opposite sex, based on the free consent of the parties."

My understanding of this section implies that it is legalizing child marriages. We cannot allow that anomaly to be in our Constitution! If we have the opportunity of correcting it so that child marriages are not legalized in our Constitution; so that adults can only marry  other adults of the opposite sex, I think we will have done much better. We will have done something more useful to more than 60 per cent of the youth and children of this country.

Mr. Temporary Deputy Speaker, Sir, I would like to draw your attention to Chapter 5 on Land and Environment. It is elaborately put. However, you will notice that Article 71 on agreement on natural resources is scantily drafted. I am saying this because I draw examples from what has happened in the Niger Delta States of Nigeria. There are conflicts revolving around natural resources there. Communities from the areas where some of the natural resources are exploited do not even get a single penny.

In this country, we are exploring oil and other minerals. We do not want these resources to be the source of conflict between certain communities and the Government. We want this section to be clarified more so that profit sharing of those resources particularly in areas that have been earmarked in this Constitution as community land is clearly spelt out, so that we can avoid going the road Sudan and the Niger Delta of Nigeria have gone.

I would also like to draw your attention to Chapter 7 on Representation of the People, particularly on Article 89(1) which increases the number of constituencies from 210 to 290. This initiative of adding 80 constituencies to those that we already have is a very good one. The gerrymandering that happened during the creation of constituencies in this country denied many people the opportunity to be represented. I can tell you for a fact that the greater Turkana where I come from is greatly under represented. You cannot imagine, an area of 77,000 square kilometers with 1.3 million people inhabiting it is, only represented by three Members of Parliament since Independence. This is an anomaly I hope and trust that the Interim Independent Boundaries Review Commission (IIBRC) will recommend to this House fairly delineated boundaries of the new constituencies that will take care of the minority and marginalized areas that had been left out.

I would also like to draw your attention to Chapter 9 on the Executive. Personally, I would have liked this country to have a Parliamentary System of Government because it has been tested in many countries in the world. We eventually gave in and said that we go for a pure Presidential System because that is what has put us together. However, we must realise that in the 46 years we have had one centre of power, that has been our problem. Since we are now saying that we continue with this one centre of power, we have to strengthen the institutions that check and balance this power so that ten years down the line, we do not come back and cry that we made the wrong decisions for Kenyans and for the future generations. I hope this House will strengthen the power of the National Assembly, the Senate and the devolved units. All these will be a counter balance to the very strong Executive we have created.

Mr. Temporary Deputy Speaker, Sir, I would also like to draw attention to Chapter 11, on devolved governments. I ask myself: Why do most of us all the time keep referring to the good case examples of how India, Thailand, Singapore, South Korea and China have progressed? These countries have progressed, not just because of the economic structures that they have had. They have progressed because of their political structures, which have supported their countries' pillars of the economy.

So, devolution is very critical to Kenya, if we really have to move from the third line to the second line and, eventually, to the first one. The countries we refer to have devolved units up to the village level. That is why they are able to deliver, particularly on the priorities. A road linking Kitale and Lodwar would be a priority for a provincial government up there. However, when the planning for the construction of that road is lumped together with that of the rest of the national priorities, it ceases to be a priority. That is the best way of doing things.

Mr. Temporary Deputy Speaker, Sir, I was recently in China, and I applauded their structures. States are competing to build roads and schools and to take children to school and do scientific research. They managed to achieve all these because they have devolved a lot of their planning and works down to the ground. It is important that, as a country, we reconsider a proper design of devolution.

For the last two weeks, we have been talking about devolution, switching from one system to another. We have been talking about a three-tier system and a two-tier system. We seem to be confused. We do not seem to know what we want. We seem not to know whether we want to create wealth for our people. This is the time for us to come up with the best way forward.

Mr. Temporary Deputy Speaker, Sir, there is nowhere in the world that one can tell me that a two-tier system of government has been tested and seen to perform, but I know that a three-tier system of government has performed. I equate a two-tier system of government to a man climbing a very tall tree and resting in the middle before climbing up to the top. Then, instead of deciding to climb down gently, he decides to jump down. What happens to that man when he jumps down that tree? He will break his legs and his hands. He will injure himself or even die. That is basically what we are doing for those who have proposed a two-tier system of government. There is no way you can move from the top, down straight to so many units at the grassroots.

Mr. Temporary Deputy Speaker, Sir, if we do that, we will overload the grassroots with so much power and resources that they will not be able to perform. If the units at the grassroots fail to perform, all those powers and resources will get back to the top, and then we will be back to the drawing board. So, I can only appeal to my colleagues that we look back to inception. In this country, we have structures that have been tested. The Provincial Administration has been with us for 46 years. We have had districts, some of which we are consolidating into counties. We have had provinces, which have been the units of co-ordinating a small number of districts, so that they free the national level to deal with critical issues that can move the country forward.

If we are not in agreement with what is being called "regional government" or "*majimbo*" – many people are equating this as *majimbo*, so that people can be removed from one area to another – let us maintain the eight provincial governments, so that they can help co-ordinate the counties that we have agreed to establish. That way, the

Provincial Commissioner, who is currently there, can be clerk in that provincial government and can represent the national government in that provincial government.

Mr. Temporary Deputy Speaker, Sir, that is the best way we can go. Eventually, after ten or 20 years, if we see that this system is not working, this House has the responsibility to review that system so as to make sure that we have a better system that can serve us better.

I will also refer to Schedule One, on counties, and make one statement. Although I was of the opinion that we needed much more than 47 counties, and even Turkana to be split into two because it is too large, some of the amendments that have been brought here have even divided the capital city into four units. I cannot imagine how a capital city can have four different units with four different taxation systems and yet we call it our capital city. I think there is a mistake in these amendments. If those who have drawn these amendments do not re-amend the amendments then I stand to support the 47 counties so that we can move forward.

With those many remarks, I beg to support any amendments that can make this document a better document for all Kenyans and which we can be proud of.

**The Minister for Medical Services** (Prof. Anyang'-Nyong'o): Mr. Temporary Deputy Speaker, Sir, I beg to support this Draft Constitution. Like my friend, Mr. Nanok, has said, with amendments that will make it a better document.

Mr. Temporary Deputy Speaker, Sir, every Constitution like this has certain principles upon which a nation or a political system is founded. The principles which are fundamental to a Constitution is to uphold the right and dignity of its people and provide them with an environment as equal citizens to develop and prosper; provided with an environment as equal citizens to develop and prosper, particularly in a Republic. If it was a monarchy, it would be a different thing. But in a modern Republic, the principle of equality of citizenship and the principle of freedom, dignity and prosperity are cardinal to the foundation of modern Republics since the French Revolution.

Mr. Temporary Deputy Speaker, Sir, our experience since Independence is, although we were founded as a sovereign Republic, the system of Government since then has denied equality of citizenship, the dignity of citizens, prosperity of all these citizens and the fact that they entered this Republic to enjoy human rights.

Mr. Temporary Deputy Speaker, Sir, right from Independence one of the reasons why Kenyans have become so fearful of the imperial presidency is that we moved from a self-governing State to a Republic without electing our President. The late Jomo Kenyatta kept on ruling this country up to 1978 without, at any time, being elected by the people. When Daniel Arap Moi took over in 1978, he equally ruled this country for 24 years without being elected by the people.

The dignity, equality and sovereign rights of these citizens were denied for all those years. Kenyans did not elect their President until the year 2002; the NARC elections which became a breather to all Kenyans. Indeed, after the 2002 elections, Kenyans became the most positive people globally. But, that again, was denied after a very short time because the system of Government that we had was still based on Presidential authoritarian rule. This led us to the election of 2007 where although citizens expressed their sovereignty and right as dignified individuals in this nation to elect a democratic Government, again, that authoritarian Presidential system landed this nation into a crisis.

Mr. Temporary Deputy Speaker, Sir, that is why this moment that we have this time to have a Constitution which, for the first time since Independence, will get rid of Presidential authoritarianism and establish a modern democratic Republic, respecting and promoting the dignity, the rights and the freedom of Kenyans,  is a golden opportunity that must not be lost. Let me also remind you that although we had the Bill of Rights and we have the Bill of Rights in the current Constitution, because of this Presidential authoritarian system, this Parliament has in the past enacted laws which were against those Bill of Rights. The detention law that was enacted in 1965 was fundamentally contrary to the Bill of Rights in our Constitution.

The enactment of Section 2 (A) into the Constitution making this country a one party State in 1982, was fundamentally against the Bill of Rights in that same Constitution. But because we had a Presidential authoritarian system, this Parliament lost its dignity and its respect of the Kenyan people by enacting into law unconstitutional laws which went ahead to stifle the freedom of the rights of Kenyans.

Mr. Temporary Deputy Speaker, Sir, when members of the Republic begin debating critically this Draft Constitution, let them not be stifled because every voice is important and every opinion matters in the making of a constitution. Although opinions may differ from ours, but in the final analysis, they must be heard because John Stewart Mills once said, if you get 100 people, 99 may be of the same opinion and one might be different but that one person who has a different opinion has as much right as the other 99. We do not know that 20 to 30 or 100 years from today, that opinion may be the opinion that may save human beings. Otherwise, what you hear about Galileo; when he said that the earth was round, but the church and the establishment insisted the earth was flat and Galileo was committed to execution because of being different. Today, astronomy and geography would not have developed the way they have, if Galileo's voice had completely been stifled.

I am not worried about dissenting opinions on the Constitution, I am much more concerned about people realising that the fundamental principles of a modern democratic Republic must be maintained and any opinion being expressed should not be expressed contrary to those fundamental values that Kenyans have always struggled for.

Mr. Temporary Deputy Speaker, Sir, when people are saying that the Constitution has struggled for 20 years, they are not being faithful to history. As far as I know, the struggle for a new Constitution after Independence started in 1965, the moment Kenyans realised that they were in for a rough time under a Presidential authoritarian system. If that struggle had not started then, the Kenya People's Union (KPU) would not have been born as a party. I was in high school when the KPU was born and we became the first members of the party youth league. At that point in time, our clarion call to the Kenyan people was:  Let us rise up and look for another Uhuru, because as far as we were concerned, Uhuru had not yet been born. That is the reason why the second Republic is to be born; we have been struggling for the second liberation because of the negation of the principles of a sovereign democratic Republic that the Presidential authoritarian regime imposed on this country since Independence.

Many people have given up their lives and have suffered in the search for this second liberation. When I was at the university in 1977 and I taught in the university from then to 1982, I had to flee this country because of the same authoritarian system. There were many people who gave up their lives and their times and sacrificed to raise

their voices so that this second liberation should come about. I can remember Rev. Lawson Imunde who was detained simply because he wrote in his diary the iniquities of the one party system. I can remember Mwalimu Mukaru Ng'ang'a who finally died because of his commitment to the second liberation, Titus Adungosi, the student leader who was tortured in prison and died under mysterious circumstances and nobody has ever known what killed Adungosi. I can remember my friend Katama Mkangi, also deceased; Ngugi wa Thiong'o; Edward Okong'o Oyugi, still alive; Oduor Ong'wen;  Dr. Willy Mutunga; Prof. Micere Mugo;  Prof. Tim Odhiambo, deceased; Hastings Okoth Ogendo, deceased;  Mike Owen, deceased; Apollo Njonjo, deceased; and Prof. Michael Chege and many others, who in those days did so much to  ensure that we do and we have resistance.

In those days, they did so much to ensure that we have resistance against the authoritarian presidential system. There were many! Of course, we know Mr. Gitobu Imanyara who is still with us and Mr. Orengo. There were such gallant women like Lilian Wanjira. There were friends like Mr. Muite, Dr. Khaminwa and many others. Indeed, in those days when we were struggling for this second liberation, sometimes not even friends would come to your house when they knew that the previous day you had been visited by the police and thrown into police cells or threatened with detention. The sacrifices that I have made to come this far are many. My fellow young turks like Mr. Raila Amolo Odinga and others did a lot to bring things to where we are today. The fathers of this second liberation must be known. There were people like Mr. Jaramogi Oginga Odinga, J.B. Kalia, Achieng Oneko and those gallant men who challenged the one party system in those early days to lay the foundation for what we are now seeing in the birth of this Constitution.

Mr. Deputy Speaker, Sir, the Bill of Rights in this Constitution has been applauded and I want to applaud it. That is because, in spite of any other thing, it is so detailed and elaborate that I think Kenyans will, for the first time, have their rights well enshrined in a Constitution. One of the biggest problems of the Independence Constitution was that, although it was so good in the rights of individuals, it was not so good in the rights of communities once the regional aspect of it was removed. The regions then and the senate were meant to be the bulwark against the presidential authoritarian regime. But once they were removed, we were left with the one party state as a rogue to terrorise the Kenyan people. In this Bill of rights, Article 19 says quite clearly:- "The purpose of recognising and protecting human rights and fundamental freedoms is to preserve the dignity of individuals and communities." That is in the Bill of Rights and it must be reflected in the system of government. That is why devolution is very important because without devolution, you will not operationalize this aspect of the Bill of Rights. The purpose of recognizing and protecting human rights under fundamental freedoms is to preserve the dignity of individuals and communities and to promote social justice and the realisation of the potential of all human beings.

Mr. Deputy Speaker, Sir, many people who stood today, including my sister, Dr. Kosgei, said that we can devolve the system of government by using the present administrative system that we have. The present administrative system has been used more by the Office of the President than the people. We want that system to be used now to operationalize this aspect of the Bill of Rights. That is why I am appealing to my fellow colleagues: Let us use the system that we have; the national government, the provincial government and the counties to operationalize what is in this Constitution and

to give those levels of government sufficient resources to realize our fundamental freedoms and rights. If we did that, we shall be faithful to this Constitution.

Further on, in the implementation of rights and the fundamental freedoms, Article 21(4) says: "The State shall enact and implement legislation to fulfill its international obligation in respect of human rights and fundamental freedoms." The Kenyan State, the Republic of Kenya, is a signatory to the African Charter on Human Rights and Individual Rights that was signed in Arusha. I was party to the drawing up of that Charter. If, indeed, we are faithful to that Charter, then we must be faithful to a system of government that implements that particular aspect of our Bill of Rights.

Further on, on 21(1), the enforcement of the Bill of Rights, the Constitution says: "Every person has the right to institute court proceedings claiming that a right of fundamental freedom in the Bill of Rights has been denied, violated,  infringed or is threatened."

We will be much better off when we are implementing community rights as said here. After the constitution comes into force and we are not devolving funds systematically to the devolved units; and we do not have a proper system to ensure that community rights are implemented, a Kenyan will stand up and claim this particular aspect of our constitution. So, this constitution is so carefully constructed to ensure that the Bill of rights is implemented and respected. I could go on and on and point out certain aspects of rights and fundamental freedoms that directly relate to the architecture of governance and devolution. Simply put, if we were to leave devolution as it is now only as two tier, there will be such a big distance between the national government and the counties that managing the counties from the centre will systematically drive us back to using the Provincial Administration, as we know it, to man the counties. At the moment, you know that the province is constructed in such way that it is meant to do the works of co-ordination and supervision but without being accountable to any elected body. The PC, the Provincial Medical Officer, all those provincial officials have no elected body to be accountable to.

The DC at least says he has a county council with elected councilors, however, weak the county council is. But at the very critical level of the province, they are still functioning as they did during colonial times when they were representative of the governors among the natives. The PC only knew that he got orders from the governor and implemented the orders. He did not care about the natives on whom he was implementing orders because they were meant to salute and obey. We have now come to a constitution which wants to promote, protect and guard community and individual rights. Let us make sure that we have provincial officials who are accountable to an elected body for purposes of  co-ordinating and ensuring the execution of government functions at the county level.  This will also be for purposes of co-ordinating services and infrastructure affecting counties within a certain region in a logical manner. It does not make sense for a major road in a county only to be managed by a county. It makes much more sense to me if the road from Kericho to Usenge was being managed by the provincial authority rather than being managed by various counties along the way who, for  purposes of raising revenue, could easily put toll stations to get their revenues. This is what happened in modern England. The reason why the King decided to shut down all kinds of principalities in England was to make England have a better system of communication.

I think we have had a good experience with provincial assemblies after independence when we had presidents at the provincial level. For example, in Nyanza, Mr. Okiki Amayo was the president of the Nyanza Regional Assembly.  At that point in time, the provinces had enough resources soon after independence to run certain services and provide investment for certain infrastructure. What Tom Mboya and his team did, and I was in High School then, was to do a very simple thing; just deny the regions the resources and then they collapse. It is not because the regions were not viable. The central government decided to deny them the resources because the Constitution allowed them to do so. This Draft Constitution is making sure that through the National Revenue Commission that we put in the Constitution, budgetary provisions flow from the national government to the devolved governments.  This will ensure that what happened at Independence does not recur.

I remember Mwai Kibaki, then the Parliamentary Secretary for Economic Planning, was at Alliance High School and a Form Three student asked him: "Mr. Parliamentary Secretary, you KANU people were in London and negotiated for the new Constitution and you brought us the Majimbo Constitution. Since we know that KANU was opposed to the Majimbo Constitution, what are you going to do about it?". I remember very clearly he told us in no uncertain terms, "we shall break it". They did break it, by denying them resources.

Mr. Temporary Deputy Speaker, Sir, let us not cheat ourselves that when we have devolved governments, they will be just a burden to the Central Government. Devolved governments are a stimulus for development because there are all kinds of resources lying idle, which the Central Government does not know about. The Central Government, for example, does not know the potentiality of Sokony'ong'o in Thata where I live. But the devolved government will know the potentiality of Sokony'ong'o in Thata as a source of good water which can also be bottled. This is the kind of development we are giving as a challenge to devolved units. Let us have devolution.

With those remarks, I beg to support.

**Mr. Chachu:** Thank you, Mr. Temporary Deputy Speaker, Sir. I support this draft Constitution, but with amendments. Constitution making is a struggle to enhance basic tenets of democracy and good governance. A Constitution is the soul of this nation.

The Constitution making process in this country has been a struggle to address some of the omissions in our current Constitution. If this draft Constitution is passed, it will embody our hope, aspirations, vision and the foundation on which we can be a better Kenya. I salute the champions of the Constitution making process in Kenya. Whether they are alive or have passed on, they deserve our salute. I salute the civil society, the political elite as well as the international community and all the other players that have brought us this far.

One of the major problems that we are trying to address in the current Constitution is the imperial presidency whereby power is so much concentrated in the hands of a few individuals or an individual at the expense of the whole nation. We have a situation where Parliament, which is supposed to represent the people of this nation, is hardly independent enough to effectively discharge its duty. We have a Judiciary that is dependent on the State, not just for funds, but even for direction.  We are trying to do away with this dictatorship and a tyrannical regime which does not care about the will of the Kenyan people.

If this Constitution is passed, it will ensure that there is separation of power between the Judiciary, the Legislature and the Executive. For the first time, Ministers of this nation will be professionals. They will be experts running the affairs of this country and re-engineering our State machinery to deliver for this nation. They will be experts vetted by Parliament to ensure equity, fairness as well as professionalism.

Mr. Temporary Deputy Speaker, Sir, for the first time, under this new Constitution, the President of this nation, once elected, will have absolute legitimacy of the entire nation. I am saying so, because for him or her to be elected, he or she will need to garner 50 per cent plus one of the total votes cast in that particular election. If there are two, they will go to each and every corner of this nation and ensure that they get votes from all the Kenyans. By that, there will be a total legitimacy even in remote constituencies on the Kenya/Ethiopia border like North Horr. This will really usher in a situation where we will have presidents who are elected with full legitimacy in the eyes of the electorate. In addition to that, they need to garner more than 25 per cent of the votes cast in more than 50 per cent of our counties, namely, a minimum of 24. That will be the face of this nation.

Mr. Temporary Deputy Speaker, Sir, the Constitution also enables the President, once elected with such kind of legitimacy, to have total liberty, to form his own team that will enable him to deliver on his manifesto and the pledges that he has made to the Kenyan people without necessarily tying his hands, but within the rule of law. The independence of the Legislature will not in any way be affected by that Presidency, simply because we also have a serious oversight role to play. We need to do some serious legislation which will check that powerful Presidency.

Mr. Temporary Deputy Speaker, Sir, we have Parliament and the Senate that are going to impeach a rogue President. We have recourse and safeguard in this Draft Constitution whereby even if we impeach a President, we do not necessarily have to pack and go home. We will send the Executive home, but stay behind to deliver and do what Kenyans have elected us to do. I think that is a very good separation of power between the two.

Mr. Temporary Deputy Speaker, Sir, the autonomy of Parliament is also being enhanced through the Parliamentary Service Commission and also some serious role that Parliament is given in the Budget making process. We will have very strong Parliamentary Committees with full powers to investigate and play some key oversight role when it comes to our main and noble duty of having oversight over the state, similar to what is happening to the Congress in the United States of America (USA).

Mr. Temporary Deputy Speaker, Sir, I have an issue with representation. While I know that representation is the heart of democracy, and we are here to represent people, I think that emphasis on population where we are saying that the formula of all the constituencies and wards should be as nearly as is possible to the population code of the nation, discriminates against the sparsely populated communities of this nation. It puts so much emphasis on population at the expense of all other parameters including geography, community interests and means of communication. This particular element needs to be addressed and amended. Effective representation is a right enshrined in this Constitution for all Kenyans. For example, my constituency is 39,800 square kilometres and it is the largest in this nation. It is larger than Western, Nyanza and Central provinces combined by a few square kilometres. That constituency, under that formula, might not be able to

get a second constituency. Even the first one will hardly pass as it is. With poor infrastructure and very poor means of communication, how can a Member of Parliament effectively represent those Kenyans?  Whether they are 200,000 Kenyans in Embakasi or 200 in Ileret, all those Kenyans need to be represented effectively by their Member of Parliament. For example, on the issue of senators, at Independence, the national representation of Upper Eastern was at 3.2 per cent. Today, 47 years after Independence, it has reduced to 2.8 per cent. With this kind of formula in this Constitution, it might even go down to 1 per cent. It is not fair. We should take care of our diversity, special needs as a nation and make sure that all Kenyans are catered for to the best of our knowledge and to the extent which our Constitution and resources can accommodate.

Mr. Temporary Deputy Speaker, Sir, I really endorse this Constitution in the aspect that through the Equalization of Fund, it has enshrined affirmative action in our Constitution. It recognizes inequity in this country. By doing that, it strives to cure the imbalances in terms of development that were created by Sessional Paper No.10 of 1965, which basically argued that the resources of this nation should be better invested in highly endowed areas at the expense of the so-called areas with very low potential. This particular provision of having this equalization Fund, to a degree, will go far in investing in some of the areas which have lagged behind in development.  It is clearly spelt out that 0.5 per cent of all the revenues collected by National Government every year will go in improving roads, provision of electricity, water and all other basic needs in the marginal areas of Kenya.

Mr. Temporary Deputy Speaker, Sir, on devolution, it is critical that we devolve both power and resources as much as possible to the grassroots. This will end this central command, a situation where everything is centralised at the centre at the expense of the periphery. I think it is critical that we provide necessary resources for the county Government to be functional. A 15 per cent of the national revenue which will be devolved to the counties is a step in a good direction.

Mr. Temporary Deputy Speaker, Sir, Parliament is the most critical organ of this Constitutional making process. I totally disagree as the hon. Member for North Horr with those who are saying that we should just pass this document as it is. I think it is an abuse to our collective intelligence as leaders of this nation. We are an organ of the Constitution making process, just like the Committee of Experts (COE), the Parliamentary Select Committee on the Constitutional Review (PSC), of which I am a member. This House has a mandate to improve on this proposed Constitution. Those who defined the Act gave us 30 days to deliberate and also amend the proposed Constitution. They had wisdom that as national leaders, we can rise to the occasion. What we are being told is that as national leaders, as Members of Parliament, we are not able to rise above ethnic or regional interests and do what is right for this nation. I think we can do so. We have the ability, capacity and the will to do that . Where we need to amend, we should amend. We should rise to the occasion.

I think, for the devolved form of governance, we should have the regions playing the critical role of co-ordinating and administrating all those counties. There is no way you can jump from the State all the way to the counties without anything in between. The reason why we have 47 counties, as we are told by the CoE is that it is the only figure legally established today through an Act of Parliament. The only reason why we have 47 counties and not 70 or 80, is the legal basis. We are in this House to make laws. We can

do what it takes to increase the countries to 70 or 80 provided that they serves the will of the Kenyan people.

Mr. Temporary Deputy Speaker, Sir, I celebrate and embrace the Bill of Rights. We have enhanced our civil liberties. Are we not doing it to a degree at the expense of our own national security? With that imitation, it does not go far enough. For instance, with the privacy act, how will officers of the National Security Intelligence Services (NSIS) get the necessary information to deter terrorist from causing havoc on this nation if they will not be able to access the necessary information to protect this State? Even in the United States of America, the mother of all democracies, after September 11, laws were enacted to reduce or manage people's liberties in the interest of the national security. I lived there for seven years of my life. I still travel to USA now and then and I have seen the changes at the airports when you are entering USA. I think at this time of terrorism and in this age of a very fragile world, with neighbours such as Somalia, we should not jeopardise our national security. Those provisions are there, but they do not go far enough.

Mr. Temporary Deputy Speaker, Sir, as I wind up, I urge that we cannot afford to be bystanders as Members of Parliament in the Constitution making process. We should stand up to our role and do what it takes to ensure that we give Kenyans a document that they deserve. I urge all my colleagues, Members of the Tenth Parliament to seize this historic occasion to take the necessary actions to usher in a new Constitutional order in our great nation.

With those few remarks, I beg to support, with some amendments.

**The Assistant Minister, Ministry of State for Planning, National Development and Vision 2030** (Mr. Kenneth): Thank you, Mr. Temporary Deputy Speaker, Sir, for giving me an opportunity to say a few words. First of all, let me thank my colleagues who are in the Parliamentary Select Committee and in the Committee of Experts for what I would call a very good job. I appreciate that Constitution-making is not easy and that we will never have a perfect Constitution at any one time.

Mr. Temporary Deputy Speaker, Sir, I am worried that after 20 years of seeking for a Constitution and getting to where we have gotten today, chances are that we might not even be able to get that Constitution, because having been at the Kenya Institute of Administration and having listened to hon. Members in this House, we want to amend virtually every section other than the word "Kenya" on that Constitution.

Mr. Temporary Deputy Speaker, Sir, it is very, very critical that we look at the Constitution-making process that has been in this House for the last 20 years. At the time when it started, anybody who was there or who was born at that time is now an adult; he is now a registered voter and is about to take a political decision on this same constitutional process that began 20 years ago.

Mr. Temporary Deputy Speaker, Sir, we have talked about an authoritarian presidency. It is important that we also look at its history. In 1964, we moved from a parliamentary system into a republican system without having to undergo an election. Mzee Jomo Kenyatta, who was the Prime Minister, simply moved into the presidency without elections and we did not create institutions under a republican system, but left them as parliamentary systems. Therefore, we never achieved what we wanted to achieve. As a result, we got an authoritarian presidency because we never created the institutions for the presidency. That is what this Constitution is trying to create now.

Mr. Temporary Deputy Speaker, Sir, when you look at the Executive, and we are saying that we want a pure presidential system, it has to be pure! It has to be a direct presidential election; you have to have a powerful Senate and you have to have a House of Representatives. Those are the three institutions that will check each other in a pure presidential system. I hope that my colleagues will not backtrack because they are so used to a parliamentary system where Members of Parliament are appointed as Ministers. That does not take place in a pure presidential system! We must be careful that we are not carried away; that we do not think we can still be Ministers and Assistant Ministers in a pure presidential system. That hybrid is what brought an authoritarian presidency. That hybrid is what has brought us to where we are today; that hybrid is what necessitated calls for constitutional remaking.

Mr. Temporary Deputy Speaker, Sir, on issues of devolution, we must ask ourselves a very clear question. What are we talking about? Is it devolution of resources or is it devolution of power? If it is both, and I have been told that democracy is very expensive, we must ask ourselves: "Do we have enough resources to finance the devolution of other forms of Government?" In my own experience, looking at the current Budget, the total gross revenues for this country this year is Kshs564 billion. Our total recurrent expenditure is Kshs603 billion, which means that we are even living beyond our means! Let us not just promise things that we will not be able to do from a financial point of view.

Can our Government be able today to sustain these systems that I have heard being proposed? If the Central Government has failed because of bureaucracy, what guarantee do we have that the other forms of devolution which will also have governments will not fail because of bureaucracy? Do we want to provide services to our people? Do we want to give our people the basic needs that they require or do we simply want to create forms of governments that will instead take the little money we have to run instead of providing services?

Mr. Temporary Deputy Speaker, Sir, I have heard people quoting the devolution system of a country known as "Nigeria" which is the size of Kenya, Uganda and Malawi put together. It is the third largest producer of oil. So, they have resources. They can afford to have the forms of regions which we cannot say are foolproof, but it is because they have resources. I would have wanted the CoE and the PSC to evaluate the total expenditure that the Government will incur if we were to go with this kind of devolution that is being proposed.

It is important that as we look at forms of governance, we realise that what the majority of Kenyans want are basic services at the grassroot level. If you look at this document and the comments most Kenyans gave, you will find that they were giving comments towards resources. They were talking about the inequitable distribution of resources in this country. That is what Kenyans were desperate to sort out. They were desperate to ensure that resources get to them. If we will bring some forms of governments in the manner of putting regions into compartments, I do not think it will be fair to Kenyans.

We want to have one country and not compartments of regions in the form of devolution. It has worked in the USA because they have 51 States and they have the largest economy in the world. They have their own ways of dealing with devolution.

However, at the end of the day when they stand for elections, they say they are one country and the communities come second.

If we want to prosper as a country, we must ensure that we talk about one country and communities later. Let us not devolve by bringing community interests first and leaving the country to bleed. It is very important that we know that we are brought together by a country called "Kenya". We must shield and protect our country. We must ensure that Kenya is given prominence, first and foremost.

Having said that, I have one or two issues I would like to ask my colleagues. Even as we pass this document which I fully support, there are two issues which I think are critical. I think that this document requires some technical cleaning. The election date being proposed as August may not be feasible in my thinking. This is because if we have signed a Treaty of the East African Community where the Budgets of the respective countries are read in June, I do not see how we will be here waiting for the Budget to be read and yet we have elections in August. One has to give way to the other.

Secondly, it is the issue of being pro-life. This is a matter that has come in the Bill of Rights. I know most of us are pro-life. Had our mothers been pro-choice we would not be here today. We would have no guarantee of being here today because they would have chosen to terminate their pregnancy. It is important to know that our mothers and women deserve better handling than having abortion. They would like to have better maternal and reproductive health care to ensure that there do not have to be stages where the word "abortion" has to arise. Indeed, we cannot constitutionalize the word "abortion."

Finally, I realise that this debate is ending on Thursday next week. I hope that we are not taking Kenyans for a ride. I hope we will not confirm that we are taking Kenyans for granted by concluding the debate on April Fools Day.
Thank you.

## ADJOURNMENT

**The Temporary Deputy Speaker** (Prof. Kaloki): Hon. Members, we have come to the end of today's sitting. Therefore, the House stands adjourned until Tuesday, 30th March, 2010, at 2.30 p.m.

The House rose at 8.00 p.m.